[Crim No. 8313. In Bank. Feb. 23, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT HENRY NICOLAUS, Defendant and Appellant.

Quentin L. Kopp and Alvin H. Goldstein, Jr., under appointment by the Supreme Court, Kopp & Skinner, Goldstein, Kopp & Skinner and Gilbert Eisenberg for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, J.—Robert Henry Nicolaus was convicted by a jury of first degree murder on three counts in a trifurcated trial on the issues of guilt, sanity and penalty. He had killed his three children by shooting each several times in the head. The jury found defendant sane at the time of the offenses and imposed the death penalty. Motions for a new trial and to

reduce the degree of the offenses were denied. His appeal before us is automatic under section 1239, subdivision (b), of the Penal Code.

Autopsies revealed the daughter Heidi had four gunshot wounds; Roberta and Donald each had three. Heidi was the daughter of defendant and his wife, Lisa; Roberta and Donald were children of his former common law marriage to Jean Lara.

A nurse testified that on May 24, 1964, at approximately 8 a.m. defendant was brought to the emergency room of the Bart Memorial Hospital at Lake Tahoe for treatment. Defendant said to her, "I have a confession to make. I killed my three children." He said he had bought them toys to make them happy, taken them for a ride, had them climb into the trunk of.the car to look for a key he told them he had lost, and shot them. The toys and other evidence were found the day of the homicides in a field in Rio Linda about 180 feet off the roadway. The statements to the nurse were made voluntarily, without any questioning by her; no police officers were present when the statements were made.

In September 1960, defendant's children, Roberta and Donald, were living with Jean Lara, their mother and defendant's former common law wife. Defendant sought legal advice to secure their custody and his then counsel testified at the trial that defendant advised him he felt that Jean was immoral and that the children were being raised in an improper environment. Counsel informed him that he would have to improve his own life and establish a proper home into which the children could be received.

Lisa Nicolaus, defendant's wife, testified that she met defendant in 1961; they went together about six months during which they would pick up Roberta and Donald on weekends and take them someplace; defendant was very fond of and generous with his children; he was most concerned about them; he believed their mother Jean was subjecting them to psychological mistreatment and physical abuse, all of which upset defendant considerably; he and Lisa decided upon a plan; they would get married, improve themselves, Lisa would finish high school, defendant would get a job, and save money; they would lead upright lives and someday obtain custody of Roberta and Donald; defendant and Lisa married September 7, 1961, and for about three years lived in accordance with their plan; they had a child, Heidi; defendant had been drinking heavily before he got a steady job, but, thereafter he

quit drinking; he did part-time work also, but lived penuriously with Lisa, spending nothing except for bare necessities; eventually they were out of debt and were able to save some money; however, she testified, she became dissatisfied with such a frugal existence and thought they should be able to spend some money on themselves; arguments occurred frequently over this issue and on May 22, 1964, the day before the homicides, she told defendant she was going to leave him. When defendant left for work she began to pack her personal effects, with the help of her mother, putting them in the mother's car; defendant came home about noon, again asked her not to leave, and expressed concern about her living with her mother whom he considered immoral and unfit to be closely in contact with their child, Heidi; there was conversation about defendant's gun; she had packed the gun with her belongings and placed it in her mother's car; defendant found the gun there and threw it in the trunk of his own car; he followed her to her new apartment; he told her he wanted to verify that she was not going to live with her mother; he returned later and took her and Heidi to a restaurant for dinner; he told her he had withdrawn his savings from the bank, and was going to enroll at Sacramento State College and take a course in public speaking because he felt someday he would "sway the crowds and the masses would be trembling at his feet;" the next morning he picked her and Heidi up and went to the home of Jean Lara and picked up Roberta and Donald. He said he wanted to have their pictures taken. He took them to a restaurant for breakfast, returned Lisa to her apartment, and then left with the children.

Other witnesses testified that at 2 p.m. defendant parked his car in an open field near some apartment houses and left it there.

Laurie Woodworth, Lisa's sister, testified: On the afternoon of May 23 defendant went to her apartment saying he was looking for Lisa; he and she drank beer and talked; defendant's demeanor was unusual, rambling and incoherent; he said he had always wanted to obtain custody of the children but now this could never be; she said, "Well, . . . you may not ever get your two older children, but you have Lisa and Heidi;" defendant said, "No, I don't have Heidi anymore."

His wife testified that later in the afternoon he found her at her apartment; told her he had left the children with his mother who was happy to see them and to babysit for him

while he took Lisa and her mother to Stateline; they went to Stateline and during the ride defendant was friendly with Lisa's mother, whereas he had always been hostile toward her previously; he said he wanted them all to "work together to save the children;" he cried and asked unusual questions; he said he felt he was going to die, and asked about heaven; he asked Lisa and her mother to sing hymns; he occasionally appeared to become paralyzed; arriving at Stateline they changed clothes and went out; defendant said he felt sick; they returned to the motel where he went to bed and lay in a "half sleep" for the rest of the night; the following morning, May 24, defendant felt weak and could not move; Lisa called an ambulance and defendant was taken to a hospital where he made the before-related confession to the registered nurse.

The gravamen of the trial on the guilt phase was the issue of premeditation and deliberation. Accordingly, first the defendant, as a matter of defense, and then the prosecution, in rebuttal, introduced testimony of psychiatrists with respect to defendant's capacity to reflect and deliberate. Each of the psychiatrists who testified at the trial had examined defendant and stated that he was cooperative and fully communicative. Their testimony included a case history which they elicited from defendant and in composite indicated:

Defendant had a strict religious upbringing. When young he did not smoke, drink or go out with girls. He joined the air force after finishing one year of junior college. At this time his attitudes changed; he embraced atheism and Marxism and began to drink and chase women. One homosexual experience ultimately resulted in his receiving an undesirable discharge from the service. When he got out of the air force he returned to college, became interested in Nazism, admired Hitler, considered himself like him, and collected books and speeches about him. He wanted his wife and children to wear armbands with swastikas on them. He would talk about how he could walk on water and break bread and feed thousands of people. He was hospitalized in the psychiatric unit of the Sacramento County Hospital in 1956 at the behest of his common law wife who reportedly had accused him of trying to kill the baby. Defendant had yelled that he was Frankenstein. He graduated from Sacramento State College in 1958, receiving a degree in psychology and social sciences. He entered into a common law relationship with Jean Lara, bearing Roberta and Donald. The relationship terminated and the mother kept

the children. Defendant was concerned about this because he considered the mother unfit to raise them. She had gone to live with an ex-convict who had molested two of her children, and he feared that it might happen to his own children and that they would grow up to be delinquents; his former common law wife was forever frustrating his desires to visit and be with the children.

When Lisa decided to leave him defendant felt his plan for securing his children had failed; he thought he would never be able to save his children from their environments which he considered intolerable; all his earlier efforts were wasted. He began drinking—this was on May 22—and drank so much that he became ill—he was still ill the morning of the homicides. He decided he would bring the children to a state of extreme happiness and kill them. At the time of the killings, he asked the children to climb into the trunk of his car and find a key that he told them he had lost there. He decided he wanted to kill them in the order in which they were born, so he had them climb into the trunk according to their ages, and with his last bit of strength he shot them, emptying the gun a second time to make sure and as a last expression of his ultimate love. He said he felt no pain and that he just went limp. Then he drove home. He parked the car in an open field because he noticed blood dripping from the trunk. He noticed blood on his clothes and changed them.

In summary, the respective psychiatrists expressed conflicting opinions on the issue of defendant's capacity to premeditate the killing of his children:

Dr. George O'Brien, a psychiatrist called by the defense, testified that in his opinion defendant was suffering from a schizophrenic reaction of the paranoic type which prevented him from premeditating when he killed the children; that in his opinion anyone who followed Hitler was psychotic; that anyone who intentionally shoots his children in the head without provocation is legally insane and necessarily unable to premeditate and deliberate; that the defendant's ''affect'' was inappropriate—he was happy and cheerful and denied having done anything wrong in killing the children. Dr. O'Brien was of the opinion the defendant was delusional and had ideas of persecution and at the time of the killings had visual and auditory hallucinations.

Dr. Elmer Galioni, the second defense psychiatrist, testified that in his opinion defendant had a mental impairment and that although it did not destroy his ability to deliberate or

interfere with his ability to plan his actions in terms of the objectives which he wanted to reach "[i]t did . . . impair . . . his ability to evaluate the impact of these actions upon the objects of his actions . . . [H]e was . . . not able to assess the impact that this [i.e., killing the children] would have upon the children, upon the mothers of the children and fully upon himself." Doctor Galioni believed that at the time of the shooting the defendant felt that "this was an extreme act of love . . . rather than an act of anger, and that he felt that he would be saving his children from the environment that he has been fighting all his own life."

Dr. John Mitchell, the third defense psychiatrist, testified that defendant appeared "to have committed an act which was more in the nature of an impulsive unplanned act. While not legally insane, his mind was impaired by his depression and intoxication hangover to the point where his judgment was impaired. At that point he saw no other alternative solution, and he acted upon the conviction that the children were better off dead than living with their mothers. . . . I believe he was mentally impaired or emotionally disturbed to the point that it acted as a severe impairment on his thinking."

Dr. Rapaport, called by the prosecution in rebuttal, testified that in his opinion defendant premeditated before killing the children in that he thought over what he was going to do, "the pros and cons," and how he should do it. He was conscious and aware of what he was doing. He was emotionally unstable but not mentally ill and did not have hallucinations or delusions (apparently at the time of the killings). When he committed the killings "he was laboring under the pressure of the fact that he had now lost all of his children . . . [h]e feared in their environment with their mother they would grow up like [her]" and might become prostitutes; he "just felt completely lost, that his dreams were gone, his plans were gone. And he just felt that this was the end." His wife's leaving him and his feeling that his life plan had failed were the cause of his decision to kill the children but did not impair his ability to make that decision rationally and after deliberation to carry it out. The doctor further testified that defendant loved his children and that it was defendant's "thinking that what he had finally planned to do was the best for the chlidren. . . . [H]e recognized the evilness of the act itself, but he felt that the fact that it was best for them overcame the evil."

Dr. John Peschau, also called by the People, testified that in his opinion defendant premeditated before killing the children. In fact, he deliberated excessively; he considered what the best thing for the children was, and what he believed, as a parent, he had a right to do. At the time of the killings defendant's thinking was "clouded," and he "wasn't functioning at topnotch quality" because he had been drunk the night before. Dr. Peschau further testified that defendant was suffering from emotional problems, that he did not consider whether or not defendant's personality was abnormal and that his "examination was directed towards consideration of whether or not he was psychotic, and if psychotic, insane. And I did not consider whether or not his personality was mildly abnormal or abnormal in a major way." Like Dr. Rapaport, Doctor Peschau concluded that defendant "had come to the conclusion that what he was doing was the best thing for the children, to save them from what he described as a hell in life. And with that conclusion he was comforted and able to go under the influence of that compulsion to carry it out so that he wouldn't have to think about it any more. And so he did."

The prosecution made a motion that the evidence produced on the issue of guilt be admitted on the sanity phase. The motion was unopposed and granted.

In addition, Doctors Peschau and Mitchell, psychiatrists called by the People, testified that defendant was aware of the nature and quality of his acts and knew the difference between right and wrong when he killed the children.

Three lay witnesses called by the defense testified that in their opinion defendant was insane. They based their conclusions on his behavior which they considered irrational. He frequently made irrational statements; he would say he was like God; that he could perform miracles and control the world; he believed devoutly in Nazism as a way of life, sometimes he reacted abnormally and violently to commonplace occurrences; he believed everyone was against him; he felt his mother-in-law was trying to break up his marriage and made violent threats to her. On May 22 and 23 he was unusually calm and remote; he talked about conquering the world; he was lavish with his money. On the trip to Stateline he cried, begged forgiveness, asked his wife and mother-in-law to sing religious hymns. He could not eat; he was clammy, cold and perspiring.

Defendant contends that:

1. The evidence is insufficient to sustain verdicts of murder in the first, rather than the second, degree.

2. The court committed prejudicial error in its instructions based upon the M'Naughton rule.

3. The foundation for the prosecution's expert psychiatric evidence was inadequate and its admission was prejudicial error.

4. The testimony of Dr. Rapaport was barred by the *Dorado* rule (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) and should have been excluded, *sua sponte,* by the court.

5. The prejudicial effect of photographs of the murdered children outweighed their probative value and their reception into evidence was error.

6. The prosecutor committed prejudicial error in expressing personal opinions during his argument.

7. It was prejudicial error for the prosecutor to cross-examine defendant's psychiatric expert on the witness' belief in God and to comment thereon improperly during argument.

8. It was prejudicial error to bar cross-examination of Dr. Rapaport on the issue of sanity.

9. The *voir dire* examination of prospective jurors deprived defendant of a fair and impartial trial, because the jurors were "death-qualified."

10. The court having expressed a "doubt," the issue of defendant's present sanity should have been tried pursuant to Penal Code section 1368.

11. Defendant was denied the effective aid of counsel.

A review of the entire record discloses that defendant was accorded a fair and impartial trial, that there was no substantial error on the issue of the plea of not guilty by reason of insanity, and that the evidence adequately supports the jury's verdict as to sanity.

1. However, the defendant's first contention, that the evidence is insufficient to sustain verdicts of murder of the first, rather than the second, degree, presents a difficult problem. ■ We recognize that every relevant and tenable presumption is to be indulged in favor of sustaining the judgment of the trial court; but as in the case of *People* v. *Wolff,* 61 Cal.2d 795, 819 [40 Cal.Rptr. 271, 394 P.2d 959], "when a proper case appears (Pen. Code, § 1181, subd. 6) we do not hesitate to modify the judgment to murder of the second

degree and affirm it as modified.'' Defendant's defense was that of ''diminished responsibility,'' more accurately designated as ''diminished capacity'' (see *People* v. *Anderson,* 63 Cal.2d 351, 364 [46 Cal.Rptr. 763, 406 P.2d 43]), in that mental impairment prevented him from acting with deliberation and premeditation. In support of this defense he produced expert and nonexpert testimony. With respect to this defense the court stated in *People* v. *Henderson,* 60 Cal.2d 482, at pages 490-491 [35 Cal.Rptr. 77, 386 P.2d 677]:

''It can no longer be doubted that the defense of mental illness not amounting to legal insanity is a 'significant issue' in any case in which it is raised by substantial evidence. Its purpose and effect are to ameliorate the law governing criminal responsibility prescribed by the M'Naughton rule. (See Lindman & McIntyre, The Mentally Disabled and the Law (1961) 355-356.) Under that rule a defendant is not insane in the eyes of the law if at the time of the crime he knew what he was doing and that it was wrong. Under the *Wells-Gorshen* rule of diminished [capacity] even though a defendant be legally sane according to the M'Naughton test, if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of murder of the first degree. This policy is now firmly established in the law of California (*People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Baker,* 42 Cal.2d 550, 569-571 [268 P.2d 705] . . . ; *People* v. *Sanchez,* 35 Cal.2d 522, 526-529 [219 P.2d 9] . . . ; *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Harris,* 29 Cal. 678, 683-684). . . .''

 What was said with reference to premeditation in *People* v. *Wolff, supra,* 61 Cal.2d 795, 822, is pertinent here:

''Certainly in the case now at bench the defendant had ample *time* for any normal person to maturely and appreciatively reflect upon his contemplated act and to arrive at a cold, deliberated and premeditated conclusion. He did this in a sense—and apparently to the full extent of which he was capable. But, indisputably on the record, this defendant was not and is not a fully normal or mature, mentally well person. He knew the difference between right and wrong; he knew that the intended act was wrong and nevertheless carried it out. But the extent of his understanding, reflection upon it and its consequences, with realization of the enormity of the evil, appears to have been materially—as relevant to apprais-

ing the quantum of his moral turpitude and depravity—vague and detached. We think that our analysis in *Holt* [*People* v. *Holt*, 25 Cal.2d 59 (153 P.2d 21)] of the minimum essential elements of first degree murder, especially in respect to the quantum of reflection, comprehension, *and turpitude of the offender*, fits precisely this case: that the use by the Legislature of 'wilful, deliberate, and premeditated' in conjunction indicates its intent to require as an essential element of first degree murder (of that category) substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill.''

It is not necessary to set forth again all of the evidence bearing upon defendant's state of mind before and at the time of the killing of his children. Although found to be legally sane, both the expert and nonexpert testimony established conclusively that defendant was not a normal person either mentally or emotionally.

Doctor Rapaport expressed the opinion that defendant was not mentally ill. However, notably absent from the case history related by him upon which his opinion was based are any references to defendant's previous bizarre and abnormal conduct given in detail in the histories relied upon by the defense psychiatrists, two of whom were court-appointed. Their testimony as to these abnormal actions is not only uncontradicted in the record but is substantiated by the evidence of other witnesses.

Both prosecution psychiatrists were of the view that defendant could and did deliberate and premeditate the killings, but neither expressed an opinion as to the extent of defendant's ability to maturely and meaningfully reflect upon the gravity of his contemplated act. In *People* v. *Wolff*, *supra*, 61 Cal.2d 795, 818, it was quite clear that the defendant had the intent to kill and to a limited extent the ability to premeditate. This court, in concluding that the judgment should be reduced from first to second degree murder, stressed that the controlling issue as to degree depends not alone on the character of the killing but also on the quantum of personal turpitude of the actor.

Upon the facts of the instant case and the law as stated in *People* v. *Wolff, supra,* 61 Cal.2d 795, we are satisfied that the evidence fails to support the finding that the murders were of the first degree but that it amply sustains conviction of second degree murder.

2. Defendant contends that the California version of the M'Naughton rule deprived him of a fair trial on the issue of sanity, and he urges that this court adopt the *Durham* rule (*Durham* v. *United States,* 94 App.D.C. 228 [214 F.2d 862, 875, 45 A.L.R.2d 1430].) ■ However, as recently as in *People* v. *Wolff, supra,* 61 Cal.2d 795, 803, this court said: "As we have repeatedly stated in recent years, the M'Naughton test (of course, as evolved and applied in the California rule) has become 'an integral part of the legislative scheme for the appraisal of criminal responsibility in California and any change therein should come from the Legislature.' "

3. Defendant claims error in the admission of the expert testimony of prosecution witness Doctor Rapaport because such testimony was based upon a single interview without augmentation by supplemental interviews with other persons acquainted with the defendant, or other outside data. Doctor Rapaport's interview with defendant was approximately three hours in duration and the doctor's training and experience in the field of psychiatry was extensive. In *People* v. *Delhanti,* 163 Cal. 461 [125 P. 1066], one of the physicians who testified had observed the defendant for an hour six days prior to trial. This was held sufficient. ■ Furthermore, although we have considered the foundation issue, it is noteworthy that no objection on the ground of insufficient foundation was interposed by defendant at trial, and the objection need not be considered for the first time on appeal.

4. Defendant contends that the testimony of Doctor Rapaport was barred by the *Dorado* rule (*People* v. *Dorado, supra,* 62 Cal.2d 338) and should have been excluded, *sua sponte,* by the court.[1] A similar objection was raised in the recent case of *In re Spencer,* 63 Cal.2d 400, 412-413 [46 Cal.Rptr. 753, 406 P.2d 33], in which we held that "the presence of counsel at the psychiatric examination is not constitutionally required so long as certain safeguards are afforded to defendant. . . . ■ "Before submitting to an examination by court-appointed psychiatrists a defendant must be represented by counsel or intelligently and knowingly have waived that right. ■ Defendant's counsel must be informed as to the

---

[1]The trial in the instant case began after *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], was decided but before the decision was rendered in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The rules in *Escobedo* and *People* v. *Dorado, supra,* 62 Cal.2d 338, but not those in *Miranda* are therefore applicable here (*Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins, ante,* p. 681 [56 Cal.Rptr. 293, 423 P.2d 221]).

appointment of such psychiatrists. (See *People* v. *Price* (1965) *ante,* p. 370 [63 Cal.2d 370 (46 Cal.Rptr. 775, 406 P.2d 55)].) ▇ If, after submitting to an examination, a defendant does not specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should not be permitted to testify at the guilt trial. ▇ If defendant does specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should be permitted to testify at the guilt trial, but the court should instruct the jurors that the psychiatrist's testimony as to defendant's incriminating statements should not be regarded as proof of the truth of the facts disclosed by such statements and that such evidence may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion.''

Other considerations are related in *Spencer* but the above reference is adequate for present purposes. ▇ The trial court did not instruct the jury as required by *Spencer,* and accordingly, defendant's contention regarding error in admitting Doctor Rapaport's testimony is correct. However, under the circumstances present here, as in *Spencer,* such error does not compel a reversal. Substantially the same history, background information, and details concerning the killing supplied by defendant to Doctor Rapaport, and testified to by the doctor, were supplied by defendant to the medical experts called by him and testified to in his own defense and, therefore, cannot be deemed to have prejudiced defendant.

▇ 5. Photographs of the dead children were introduced in evidence, without objection. They were not inordinately gruesome. Defendant now urges that their prejudicial effect outweighed their probative value and it was error to permit their admission; that there was nothing of evidentiary value in the photographs that had not been testified to by the autopsy surgeon. The trial court carefully considered each photograph, admitting some and rejecting others. It is the province of the trial court to determine the issue of prejudice in the admission of such evidence and there was no abuse of discretion shown. The photographic evidence was material, and no miscarriage of justice resulted from its admission during the guilt phase of the trial.

6. Defendant claims the prosecutor injected unjustified personal remarks into his argument to the jury calculated to demean the character of Doctor O'Brien's testimony. For example: ''I find it hard to have a proper respect for Doctor

O'Brien''; ''Ever since I heard his testimony I am thinking of changing my name from Sullivan to something else. He didn't remind me of any of my relatives, I'll tell you that.'' Such type of argument based on personalities is improper. However, a review of the record discloses that the prosecutor's arguments were directed to his own objective analysis of the evidence and not upon his personal views. ▇ Counsel at trial made no objection to the remarks, which could have been corrected by timely admonition or proper instructions; they need not be considered, therefore, for the first time on appeal. (*People* v. *Wein*, 50 Cal.2d 383, 395 [326 P.2d 457]; *People* v. *Brice*, 49 Cal.2d 434, 437 [317 P.2d 961]; *People* v. *Romano*, 197 Cal.App.2d 622 [17 Cal.Rptr. 399].)

▇ 7. A similar reference to Doctor O'Brien's answer to the prosecutor's question, ''Do you believe in God, Doctor?'' the doctor stating, ''I think it's irrelevant.'' is contended here to constitute further prejudicial misconduct. The prosecutor, in his argument to the jury, distorted this answer by the following statement: ''Dr. O'Brien who thinks it's irrelevant that he took an oath before God to tell the truth. He thinks it's irrelevant.'' There was no objection by trial counsel to the questions asked Dr. O'Brien of this nature and their total effect is not of sufficient gravity in the context of this case to constitute reversible error.

▇ 8. During the guilt phase of the trial Doctor Rapaport was asked by defense counsel: ''But if he believed that it was not evil, to that extent he didn't appreciate the distinction between right and wrong, did he?'' The doctor stated, ''Well, I don't know whether you want to get into the issue of—'' Here the court interposed the statement, ''We do not. The question is improper.'' The trial court was correct. During the guilt phase of the trial the trial court should properly limit the medical testimony to the issue of mental capacity to commit murder in the first degree. Such rule is stated in *People* v. *Wells, supra,* 33 Cal.2d 330, at page 351: ''Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible.'' (Pen. Code, § 1026; see also *People* v. *Henderson, supra,* 60 Cal.2d 482; *People* v. *Gorshen, supra,* 51 Cal.2d 716.) The circumstance that Dr. Rapaport was not in court

to be cross-examined at the time of the sanity phase, his testimony having been admitted on motion for such phase, was a procedural lapse not attributable to the prosecution, but rather to the defense.

9. Defendant contends that the *voir dire* examination of prospective jurors constituted a brain-washing technique, sanctioned by the trial court, to select a "death-qualified" jury, and denied defendant a fair and impartial trial. Over 20 pages of interrogation of the jurors are recited to demonstrate the purported overemphasis placed upon the freedom of the selected jurors to impose the death penalty.

Defense counsel recognizes that this court has repeatedly held that a prosecutor has a right to ascertain from prospective jurors whether or not they entertain conscientious opinions against capital punishment, citing subdivision 8, section 1074, of the Penal Code; *People v. Mitchell,* 61 Cal.2d 353 [38 Cal. Rptr. 726, 392 P.2d 526]; *People* v. *Spencer,* 60 Cal.2d 64 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Ketchel,* 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Pike,* 58 Cal. 2d 70 [22 Cal.Rptr. 664, 372 P.2d 656]. Defendant contends, however, that these cases should be overruled, complaining, in effect, that a death-qualified jury does not constitute a jury of one's peers; that it cannot answer guilt-innocence questions as favorably to the defendant; that it cannot be impartial on the nature of punishment in the event of conviction; that it does not take into the jury room a pattern of attitudes characteristic of the community at large; that such a jury is authoritarian in nature and not disposed to humanitarianism. Such contentions are untenable, not only for the reasons stated in the foregoing cases, but specifically, were even one juror committed to a policy opposed to imposition of the death penalty in a proper case the rendition of justice in murder cases, as presently defined in our statutes on the subject, could be nullified. Any fundamental change in such law falls within the legislative domain.

10. In the trial court at the time for entry of defendant's plea the public defender requested a one-week continuance "because I am awaiting one medical report." The court inquired if any psychiatrist had yet been appointed and stated that he would be guided by such psychiatrists, adding, *"It is very questionable in this case—quite a problem."* From such italicized statement counsel contends that a sanity trial should have been ordered at that time pursuant to section 1368 of the Penal Code which provides that "If at any time during

the pendency of an action and prior to judgment a *doubt* arises as to the sanity of the defendant, the court *must* order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury. . . .'' (Italics added.)

In the instant case the court had also asked the question, ''Have you got enough in your reports for me to express a doubt—as to the present sanity?'' Such query places the case directly under the application of *People* v. *Ashley*, 59 Cal.2d 339, in which the court stated at page 363 [29 Cal.Rptr. 16, 379 P.2d 496] : ''Certainly a judge, particularly in a case where the death penalty may be imposed, has the legal right to seek expert assistance to inform him as to mental condition of the defendant before he is required to express whether he has the 'doubt' as to that condition as that term is used in section 1368.'' Accordingly, no error is involved because of the court's remark.

11. Defendant's charges that at the trial level he was denied the effective aid of counsel. He indicates 12 instances of the trial counsel's purported ineptitude now viewed in retrospect. In this regard remarks of the trial court are helpful. The court stated, referring to defense counsel at a point during the trial when the absence of a witness necessitated a continuance: ''Mr. McDonnell, I have known you for a great many years, as a prosecutor, as a private counselor and as a public defender, and you have my complete confidence. You have done everything possible to justify that confidence in the years you have been before the bar. I have confidence in your approach to this case. I know you are working as diligently as you can, and I am sure you are working in the interests of this defendant. Your conduct of the case is based on experience going back some twenty years. So you need not apologize. *I state that for the record,* incidentally.'' (Italics added.)

The record indicates that defendant did receive the effective aid of counsel. The sole defense on the important guilt issue was that of diminished capacity and defense counsel introduced a considerable amount of testimony directed to this issue and delivered extensive argument on the subject. In the principal case relied upon by defendant, *People* v. *Ibarra,* 60 Cal.2d 460, 464-465 [34 Cal.Rptr. 863, 386 P.2d 847], counsel's unawareness of a rule of law deprived defendant of a crucial defense. No crucial defense was omitted by trial counsel in the instant case.

The judgment is modified by reducing the degree of the crimes to murder of the second degree and, as so modified, is

affirmed. The cause is remanded to the trial court with directions to arraign and pronounce judgment on defendant in accordance with the foregoing ruling.

Traynor, C. J., Peters, J., Tobriner, J., and Sullivan, J., concurred.

MOSK, J.—I dissent.

This case involves substantially the same legal problems as *People* v. *Goedecke* (1967) *ante*, p. 850 [56 Cal.Rptr. 625, 423 P.2d 777, and I therefore reach the same conclusion as my dissent in *Goedecke, ante,* p. 862.

Unlike *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], in which the mental condition of the defendant was indisputably shown, here there was a sharp conflict in the expert testimony. In the guilt phase (as distinguished from the sanity and penalty phases) three psychiatrists strongly supported defendant's theory of diminished capacity; on the other hand, Dr. Rapaport and Dr. Peschau, for the prosecution, found defendant able to form the intent required for first degree murder.

The following conclusions appear in Dr. Rapaport's testimony: defendant "had mental capacity to premeditate and deliberate prior to the actual killings"; he was "aware of the nature and consequences of what he planned to do"; he was "able to reason and to deliberate and to form a conclusion"; his mind was not "clouded in the sense that it was distorted, or that things were blotted out which should not have been blotted out"; his "judgment was not clouded to the extent that it interfered with his ability to form a conclusion or a judgment"; in fact, "he did deliberate"; "I don't think he had an irresistible impulse"; he was "not mentally ill"; "I found his personality not to be disintegrated"; "he still retained his personality"; "his feelings were perhaps a little more colored by emotion than the average . . . . But not to the extent of mental illness"; "He realized the wrongfulness of what he was doing, according to the way society looks at it, according to the way laws are written"; "He recognized the enormity of the deed."

The following quotations are from the testimony of Dr. Peschau: defendant "had deliberated what he was going to do to a great extent, trying to decide whether it was the best thing according to his rights to do with his children"; "the alcohol he had consumed the night before had clouded his judgment

somewhat, but not to the extent to interfere with his ability to premeditate''; the alcohol prevented his ability from being "top-notch quality, but it still would be normal carrying on''; "He did not have enough depression, however, to interfere with his ability to function''; "he had thoroughly considered what he had to do and what was necessary for the welfare of his children''; he had the "ability to meaningfully reflect on everything he did''; his impairment was "not to the point of making it impossible for him to decide''; his alcoholic toxicity "would not interfere with [his functioning] appreciably''; "Mr. Nicolaus is suffering from emotional problems. They are emotional problems at the neurotic level and do not interfere with his ability to function, but they do interfere with his ability to adjust''; he had a recognition and a realization of the enormity of the evil of the act that he contemplated doing in connection with his children; "He had already considered the quality pro and con for a long time before, and so he then was able to carry out what he had carefully thought out and what he had designed for himself to do. He then did that and later became depressed and remorseful over what he had done''; "He was capable of thinking about it and changing his opinion up until the point where he pulled the trigger.''

In weighing the divergent conclusions of the five experts, the jury apparently adopted the premises of Doctors Rapaport and Peschau. The foregoing excerpts from their testimony indicate adequate evidentiary support for the verdict. While this, like *Goedecke*, is a bizarre tragedy, that circumstance alone does not justify an appellate court substituting its view of the evidence for that of the trier of fact. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].) As said by Justice Stewart in *Berenyi* v. *Immigration Service* (1967) 385 U.S. 630 [17 L.Ed.2d 656, 87 S.Ct. 666], an appellate tribunal "possesses no empirical expertise to set against the careful and reasonable conclusions of lower courts on purely factual issues.''

I would affirm the judgment.

McComb, J., concurred.

# MEMORANDUM CASE