[Crim. No. 452. Fifth Dist. June 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. GARY
RAYMOND PARKS, Defendant and Appellant.

George A. Lagomarsino, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Jack R. Winkler, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—The appellant, Gary Raymond Parks, was convicted by a jury of the crime of murder in the second degree. The evidence, if properly admitted, was amply sufficient to justify the verdict. The appellant objects to the admission of a number of items of evidence and contends that the record indicates that there was no showing of malice on

the part of the defendant and that, therefore, his conviction of murder was improper.

In the early morning hours of August 19, 1966, shortly after midnight, Parks entered The Pioneer Club, a beer bar located at the corner of Auburn Boulevard and El Camino in Sacramento; there he argued and fought with some of the people who were patronizing the bar; he made a general nuisance of himself by attempting to drink the beer which had been placed in front of various patrons, and by uncalled for remarks. Eventually he was forcibly removed by some of the men present. After a lapse of time, variously estimated by witnesses at 10 to 20 minutes, the patrons heard several sharp explosive noises and thought at first they were caused by fire crackers. But Vivian Osborne, sitting on a stool at the bar slumped to the floor with what proved to be a fatal gunshot wound of her head. When police arrived, she was dead.

The police department acted quickly and effectively. Police Sergeant Thomas Stark was told about the fight which had occurred earlier, that the person who had been thrown out of the bar drove a clean-looking pickup, and that he had previously been seen around Sacramento driving such a car with an Ad-Art sign on it. The police instantly telephoned to the manager of the Ad-Art Company and obtained the name and telephone number of another employee by whom they were told the name and address of the defendant. In response to a rapidly conducted search, the officers found in the bar itself a copper fragment of a bullet and marks on the wall near the point where the deceased had been sitting; one of the patrons in the bar found a slug, which he turned over to the police.

Sergeant Stark, accompanied by other officers, went to the home of the defendant and when they stated they were police seeking the appellant, they were let into the house by the defendant's wife who indicated the location of Parks' bedroom. The officers awakened him and noted that his nose had been bleeding recently and that his face was puffy, indicating that he had suffered some injury from the fight in the bar. Other officers searched the premises and initially found a .22 caliber rifle and a .410 shotgun, also locating in the garage four unexpended rounds of .30-.30 ammunition and a gun case. However, the rifle and the shotgun did not appear to have been fired that day. As the officers were conferring outside the house, defendant's wife called Officer Stark back into the home and showed him a Winchester .30-.30 under the sofa cushions in the living room. It had the smell of freshly burned powder about it.

Later, Stark returned to the bar area with a surveying instrument and a tape measure which he used in attempting to trace the field of fire; one of the officers, as a result of this inspection, located three .30-.30 shells, two unexpended and one expended, dropped behind the fence which was in the line of fire across the street from the bar. The Bureau of Criminal Identification later, after investigation and analysis, reported that the expended shell could have been used in the .30-.30 rifle taken from the house of the defendant.

The county autopsy surgeon testified that the death of a Vivian Osborne was caused by a bullet from a high-powered rifle, which, of course, was consistent with the thought that the defendant's .30-.30 rifle had been used. Allen Gilmore, a criminologist, testified that after applicable experimentation he concluded that the fragment and the bullet found at The Pioneer Club most probably had been ejected from the Winchester rifle taken from the defendant's home.

Several witnesses said that they could not tell whether the defendant was drunk or sober when he was in The Pioneer Club, but the defense called a number of witnesses who had seen him previously that evening at another bar, called "The Body Shop," and who gave it as their opinion that he was then drunk. Two psychiatrists hired by the defendant said that in their opinion the appellant was so mentally ill as the result of drinking and so affected by alcohol that he could not have entertained premeditation or malice. Allen Gilmore, the criminologist called by the People, had found .14 percent of alcohol in the blood of appellant at 5:40 a.m. on the day of the shooting; from this fact he reasoned that the alcoholic content present at the time of the killing could have ranged between .20 and .22 percent.

Six different contentions are made by appellant's counsel in his argument that there should be a reversal of the conviction. ██ First of all, appellant complains of error in that the gruesome exhibit of a picture of Vivian Osborne after death with her hair cut short must have raised an unnecessary prejudice against the defendant. He argues that the judge could not have weighed the necessity and effect of proof in connection with this exhibit as against the prejudice which would be raised by its introduction. (*People* v. *Ford,* 60 Cal. 2d 772, 801 [36 Cal.Rptr. 620, 388 P.2d 892].) However, the record indicates, at least inferentially, that the judge gave grave consideration to the question whether the exhibits should be received. Counsel for the defendant had argued that

there was no purpose or necessity from the evidentiary standpoint for permitting the picture in evidence; the trial judge noted the objection and said he would reserve his opinion as to admitting the picture, although he then permitted the introduction of other photographs. Still later the judge ruled that the exhibit could be received in evidence; one could properly derive from these facts the conclusion that the judge performed his duty of weighing the admissibility of the photograph by comparing its evidentiary value as opposed to its claimed prejudicial effect. The photograph was legitimately received in evidence to prove the identity of the body examined by the autopsy surgeon. Furthermore, a view of this photograph would not, in our opinion, tend to inflame the passions of jurors. We find no error in receiving the picture in evidence.

The defendant next contends that it was improper to permit the opinion of Officer Stark that the bullet causing death was from a high-powered rifle. It should be noted that such fact was already in evidence through the testimony of the autopsy surgeon that the wound to the victim was ''evidently made by a very high-powered gun.'' The autopsy surgeon also testified, ''This gun was fired at a distance of several feet at least from the deceased because when a gun is fired at short length you usually get either powder burns or grease rings.'' However, it seems clear to us that Sergeant Stark established his qualifications as an expert; he testified that he was a detective sergeant of the Sacramento Police Department; that he had been experienced in the detective division and had also been with the Sacramento County sheriff's office; on other occasions he had examined probably 50 to 100 victims of gunshot wounds, and, based on that experience and on an examination of the victim, he had formed the opinion that the wound had been caused by a bullet from a high-powered rifle. The officer also testified that he had had training with firearms and had taken courses relative to guns and ballistics; he had observed the effects of various types of weapons on various substances, and had noted the appearances caused by high-velocity missiles upon striking objects. On *voir dire,* in answer to questions asked by the defense counsel, he said he had seen a particular type of head wound made by high-powered rifles on two occasions. After the *voir dire* there was no motion to strike. We believe that the trial judge was acting within the legitimate area of discretion when he found a proper foundation for admitting this evidence.

 Objection is also made to the detailed testimony concerning how Sergeant Stark estimated the course of the bullets which were fired into the barroom. He first ascertained where the victim was seated and her position as she lay on the floor after her death, the evidence of gouge marks on the wall where the bullet had hit, and the relationship of the place where the victim was seated with respect to the marks and to the door to the bar. The witness took into consideration the statement of some of the persons present at the time of the shooting, that the bullets must have entered the open door; he deduced that the course of the fatal bullet must have traveled in a cone defined by the wound in the victim's head and the area of the door itself. In this connection he used a surveyor's instrument and a tape measure, and by making marks on the fences across the street from the bar he established a cone of fire within which to look for bullets. He did find bullets in that area, two unexpended and one expended, which an arms expert found to have been consistent with use in the appellant's Winchester rifle. It seems to us that Sergeant Stark was well qualified to give testimony of this kind; it does not take an expert to use a tape measure or the low-powered telescope in a surveying instrument to find a tentative line of fire, as here; he might have secured the same data, perhaps a little less accurately, without either.

 The next contention is that defendant was arrested without reasonable cause, and that therefore the Winchester rifle and the ammunition found in his home were improperly removed by the police. This contention is without merit. The location and name of the defendant were responsive to the fact that he customarily and on the evening of the crime was driving a pickup truck which was in neat condition and had an Ad-Art sign on it; it had been seen by various people who were in the bar, and the information had been given to the investigating police and checked by them. The wife of the defendant volunteered that Mr. Parks had been absent from home during most of the evening, had returned for two or three minutes at a late hour, had then gone out again, and had finally returned to his home and had gone to bed. The police noted that he showed signs of having had a recent nosebleed and that his face was puffy and red, indicating that he had been struck in the face at the bar, as was reported to the officers by some of the people there. The clothes worn by him and described to the officers at the bar were the same as the clothes in his bedroom, and the car at his home was the same type as that noted at the bar.

The arrest was fully justified and it was proper for the police to take into their custody the rifle and ammunition found in connection with the arrest.

■ It is next contended, apparently, that the jury was bound to accept at a hundred percent valuation the opinion of the two psychiatrists privately hired by the defendant, to the effect that the defendant was incapable of premeditation or malice by reason of his mental condition caused by his drinking, and that therefore he could not be held guilty of murder. However, as is said in *People* v. *Wolff,* 61 Cal.2d 795, 804 [40 Cal.Rptr. 271, 394 P.2d 959], quoting the Penal Code: " 'The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion if it shall be found by them to be unreasonable.' (Pen. Code, § 1127b.) "

■ There is direct and positive evidence which in itself indicates the existence of malice on the part of the defendant. Having been forcibly ejected from this bar, the defendant rushed to his home, got the .30-.30 rifle and ammunition, returned to the scene and, firing from across the way, shot into an occupied bar, obviously for the purpose of revenge. As is said in *People* v. *Conley,* 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911] : "When a defendant ' "with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death," ' he acts with malice aforethought."

■ Next, the defendant claims that the court committed error by giving a first degree murder instruction to the jury. It was within the province of the jury, in view of the evidence, to have found premeditation and first degree murder; therefore, there was no error in giving the instruction. It should also be noted that giving instructions which are correct in the abstract is not ground for reversal unless prejudice is shown, and no prejudice was shown here in that the verdict was not first degree but, rather, second degree murder. (*People* v. *Russell,* 59 Cal.App.2d 660, 664 [139 P.2d 661].)

■ Finally, it is urged that the court committed fatal error in failing to instruct the jury that the testimony of the two defense psychiatrists, Dr. Green and Dr. O'Brien, as to what defendant had told them in connection with their examinations could be considered only in regard to the validity of their respective opinions. While no direct authority is stated for this claim, it is apparently based on a confused applica-

tion of the rule in *In re Spencer,* 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33]. Summarizing the *Spencer* ruling in *People* v. *Anderson,* 63 Cal.2d 351, 367 [46 Cal.Rptr. 763, 406 P.2d 43], and again in *People* v. *Price,* 63 Cal.2d 370, 379 [46 Cal.Rptr. 775, 406 P.2d 55], the Supreme Court has stated: "We held in the most recent *Spencer* case . . . that if the court-appointed psychiatrist may reveal defendant's statements at the guilt trial, defendant should be entitled to the protection of counsel at the psychiatric examination. Yet, in order to avoid the disruption of psychiatric examinations by court-appointed psychiatrists, we established certain safeguards to assure that the courts' refusal to permit the presence of defendant's counsel during such an examination would not involve a constitutional deprivation. Thus we stated that the court-appointed psychiatrists should not be permitted to repeat the defendant's statements at the guilt trial unless the defendant specifically placed his mental condition into issue. Moreover, the trial judge should instruct the jury that the psychiatrist's testimony at the guilt trial which disclosed defendant's statements should be considered only for the purpose of exposing the information upon which the psychiatrist based his opinion and not as evidence of the truth of the statements."

In *People* v. *Nicolaus,* 65 Cal.2d 866, 880 [56 Cal.Rptr. 635, 423 P.2d 787], as in *In re Spencer, supra,* failure to give the limiting instruction was held not to have prejudiced the defendant. In *People* v. *Price, supra,* 63 Cal.2d 370, 380, the court reversed a conviction holding that in the absence of the limiting instruction, the testimony of the court-appointed psychiatrists as to defendant's statements to them given in the absence of defense counsel violated defendant's constitutional right to counsel.

Obviously, the *Spencer* rule has no application to this case, because here the psychiatrists were privately retained by the defense and were not appointed by the court; they could not in any way be considered agents of the prosecution or of the court. Furthermore, appellant's trial counsel himself elicited appellant's admissions to the doctors, and that was his privilege under Evidence Code section 802. ■ It seems obvious that when a defendant hires a psychiatrist and in his own examination elicits an opinion with respect to the defendant's mental condition based in part on what has been told him by the defendant, the way is opened up to the prosecution to cross-examine in order to secure, if possible, an opinion favor-

able to the prosecution; the state is not prevented, in such circumstances, from making a full examination; and the testimony is thereafter useable for all purposes.

The judgment is affirmed.

Stone, J., and Gargano, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 11. 1968.