[Crim. No. 5560. Third Dist. Oct. 30, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT DOYLE McQUISTON, Defendant and Appellant.

## COUNSEL

Robert F. O'Neal, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Daniel J. Kremer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BRAY, J.**[*]—Defendant appeals from conviction, after jury verdict, of two counts of first degree murder, penalty fixed at life imprisonment, and one count of second degree murder.

### QUESTIONS PRESENTED

1. The evidence does not show diminished responsibility as a matter of law.

2. No prejudice in court's failure to instruct concerning defendant's statements to the psychiatrists.

3. No inconsistency between jury finding defendant guilty of first degree murder in the killing of his children and second degree in the killing of his wife.

### RECORD

Defendant was indicted on three counts of murder. He was represented by the public defender. The jury returned verdicts finding defendant guilty of murder of the second degree as to count one (murder of Kay Sadako McQuiston, his wife), and of murder of the first degree as to counts two and three (murder of Anna and Lillian McQuiston, his daughters). After a hearing, at which the prosecution waived an opening statement and presented no evidence, the jury set the penalty as to counts two and three at life imprisonment. Defendant's motion for a new trial was denied, and defendant was sentenced to life imprisonment upon counts two and three and to imprisonment for the term prescribed by law as to count one, all sentences to run concurrently.

### FACTS

Defendant in 1955, while in Okinawa, married Kay Sadako. After his discharge from the army he remained there as a civilian employee. In 1959

[*]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

he returned to Sacramento with his wife and their two daughters. After failing in an attempt to establish his own business, he went to work for his present employer as a truck driver. There were a number of marital problems, continuing up to the time of the homicides. On one occasion in 1960, returning home defendant found his wife in bed with another man. His wife found out three weeks before the homicides that he was seeing another woman. Because he felt his presence was imperative since the children were of "mixed parentage," he did not separate from his wife. He was very close to the children, he and the children participating in events together without his wife. She threatened him with divorce numerous times, whenever he displeased her.

On April 21, 1969, defendant left Sacramento on his truck run to the Los Angeles area. That night in a phone call to his wife defendant learned that she had filed for divorce. Thereafter he placed several phone calls to her in endeavor to save the marriage or agree to a separation for the sake of the children, 10-year-old Anna and 11-year-old Lillian. Mrs. McQuiston refused to reconsider her decision. Defendant remained in Los Angeles through April 23, gathering four or five hours' sleep while his truck was being loaded.

At approximately 4 a.m., April 24, he arrived at his home after parking his truck at the truck yard. He awoke his wife and presented her with some roses. The couple began to talk about their marriage. The discussion became heated. Defendant begged his wife to reconsider for the welfare of the children. He believed that in the event of a divorce his wife would get custody of the children and without his guidance and presence the girls' lives would "go to hell" and they would be "pushed around" because of their youth and mixed parentage.

Despite his pleading, his wife remained adamant, saying, "I just don't care anymore." Angered, defendant struck her about her face with his fists. Her nose bled and she struck back, although without harming defendant. She weighed only 92 pounds. She said, "That's just what I've been waiting for, you put a mark on me I'm gonna fix you good."

Defendant described himself as a man with a violent temper. He went to the couple's bedroom closet, obtained therefrom a loaded rifle and confronted his wife, threatening to shoot her and himself if she refused to reconsider. She told him to "Go to hell," that she had seen her lawyer. When he repeated his threat, she told him to "Go ahead." Stating later, that then he "more or less had to, you know." He racked a shell into the rifle's chamber and shot his wife three times in the face, abdomen and pelvis, causing her death. He then proceeded to the bedroom where his two daughters were. The girls were awake and knew an argument had been going on. In fact, on

one occasion, they went into the living room but were sent away. The girls were standing in the bedroom crying. Defendant could not remember whether either girl said anything. However, a neighbor heard a child scream "Daddy, Lord, Daddy," followed by gunshots. Defendant shot both girls repeatedly and fatally, Anna three times, Lillian four times.

Incidentally, everything that occurred that morning comes from the mouth of defendant as there were no witnesses.

Shortly thereafter defendant phoned the police telling them that he had just killed his family and planned to kill himself; that he did not need an ambulance because he had made sure they were all dead. He then rigged a coat hanger to the trigger of the rifle and attempted to shoot himself, merely inflicting a powder burn near his eye. When the officers arrived, he made another unsuccessful attempt to shoot himself.

## DIMINISHED RESPONSIBILITY

Defendant does not attack the verdict of the jury as to second degree murder in the killing of his wife. He contends, however, that because of the doctrine of diminished responsibility, the evidence shows as a matter of law that he was unable to premeditate or deliberate in the killing of his daughters, and hence the degree of their murders should be reduced to second degree.

In spite of the fact that two psychiatrists, Dr. Walter Rapaport and Dr. Carl E. Drake, called by the prosecution, came to different conclusions than those of Dr. James R. Richmond, defendant takes the position that only the diagnosis of the latter should be considered.

In 1953 while in the army defendant fainted twice due to a "hyperventilating reaction" and was rated "an extremely unstable individual" who had had "moderate severe emotional difficulties" for a number of years. However, in 1953, it was stated that his "emotional instability reaction had been removed."

Dr. Richmond testified that, in his opinion, defendant was legally sane at the time of the offense and the trial; that at the time of the homicides he had the capacity to know what he was doing and the capacity to know that what he was doing was wrong; and that he could harbor malice aforethought in the sense of an intent to kill and could premeditate. However, Dr. Richmond concluded that defendant was incapable of deliberating, that is coolly and calmly weighing the pros and cons of his proposed actions.

Based on the same information given Dr. Richmond, in addition to interviews with defendant, Dr. Rapaport and Dr. Drake opined that at the time

of killing his daughters defendant not only could deliberate but, according to his own admission, did deliberate.

Under his own testimony it appears that while he became "enraged" at his wife, his anger was never directed at his children. His feeling was one of sadness towards them, and he coolly and calmly deliberated over the fact that the children would always live in the shadow of his having killed their mother; that without a mother and a father (who would be in prison or put to death) life would be terrible, so he decided for their good and happiness, or at least lack of unhappiness in the future, to kill them. He deliberately made sure that they were both dead. When he phoned the police after the killing, his voice was normal and serious and not hysterical.

Although defendant testified that on the morning of the shooting he had a headache, hot blood rushing to his head and sweating symptoms similar to those he had in the army many years before, his detailed statement to the officers concerning the shooting did not mention such conditions. Moreover, in his statements to the psychiatrists he did not indicate that these had any effect on his considering what he would do with his daughters. Additionally, when the officers arrived immediately after the killings, he complained of no such physical conditions.

Defendant denied to Dr. Drake that he was in a state of emotional shock at the time of the killings and stated to both Dr. Drake and Dr. Richmond that he killed his children from mercy and were he presented with the same situation, he would repeat his actions.

 The determination of the degree of a crime is generally left to the discretion of the jury. The reviewing court on appeal is bound to view the evidence most favorably in support of the jury's judgment. (*People* v. *Ford* (1966) 65 Cal.2d 41, 51 [52 Cal.Rptr. 228, 416 P.2d 132].) The jury's judgment should be upheld unless substantial evidence of the elements required to constitute the degree fixed is found to be lacking. (*People* v. *Bassett* (1968) 69 Cal.2d 122, 137-138 [70 Cal.Rptr. 193, 443 P.2d 777].)

 It is not the numerical fact of the opinion of two psychiatrists against one that is important in this case, but the reasoning of those two supported by defendant's own statements to the police, the psychiatrists and on the stand. While defendant, on testifying, denied in a conclusionary fashion that he deliberated before killing his children, his statements show that from the time he killed the mother, he was deliberating whether it would be better for the children to live or to die. He told the police that about five minutes intervened between the shooting of his wife and the shooting of his children. "I felt that after I'd shot her and then what was going to happen to me they wouldn't have no life anyway." He also decided

to kill himself to make certain that the entire family was wiped out, only to fail due to his inability to manipulate the rifle by means of a coat hanger attached to the trigger. Arrival of the officers frustrated further attempts.

In *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], the court stated the types of evidence necessary to sustain a finding of premeditation and deliberation in a homicide case based upon circumstantial evidence (and it must be remembered that the instant case is not a circumstantial one but based on the direct evidence of the killer). Assuming that the three types therein mentioned are applicable to a direct evidence case, there is substantial evidence thereof in the case at bench: "(1) [F]acts about him and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' actively." As shown, defendant deliberated over the question of whether the children would or would not be better off if he let them live, and deciding not to let them live, he planned to make sure that he did not just wound them but actually killed them. He even leaped on Anna's bed to shoot her again to make sure the job was thorough. "(2) [F]acts about the defendant's prior relationship and/or conduct with the victim, from which the jury would reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a preexisting reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed.'" The prior relationship of defendant and his children was such that he would not have killed them had he not determined deliberately that he was acting for their good. Moreover, there was nothing in his activity after he had vented his anger on his wife to indicate that such activity was "'mere unconsidered or rash impulse hastily executed.'" "(3) [F]acts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his . . . [victims' lives] in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." Clearly the evidence shows that defendant's mercy killing was according to a preconceived design to take the children's lives for the reason that he had concluded that they would thereby be better off, and he was particular to see that he did a good job of the killing.

### INSTRUCTION IN STATEMENTS TO THE PSYCHIATRISTS

■ Although not raised by defendant, the Attorney General has asked for a ruling concerning the fact that the court did not *sua sponte* instruct the jury that defendant's statements to the examining psychiatrists were not

to be considered as evidence of the matters asserted but only as support for the psychiatrists' expert opinion. *In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33], seems to require such instruction.

As in *Spencer* the failure of the court to give such instruction in the instant case was harmless. Defendant's statements to both the prosecution and defense psychiatrists and his testimony at the trial were virtually identical. In *People* v. *Nicolaus* (1967) 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787], the failure of the court to give such an instruction was held nonprejudicial for the reason (as here) the details concerning the killing given to all the psychiatrists in the case and by the defendant on the stand were substantially the same.

### No Inconsistency in Verdicts

■ The jury's determination that the killing of defendant's wife was murder in the second degree did not preclude its finding that the killing of the children was murder in the first degree. All doctors opined that the murder of the wife was done in anger, and was rash, improvident and done without deliberation and thought. This murder prompted the deliberation and consideration that led to the murder of the two daughters.

Judgment is affirmed.

Pierce, P. J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 23, 1970.