[Crim. No. 12787.   Second Dist., Div. Three.   Feb. 20, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. HARRY EARNEST CAYLOR, JR., Defendant and Appellant.

Gilbert F. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

COBEY, J.—This is an appeal from a judgment[1] of conviction of murder which the trial court, as the trier of fact, found to be of the first degree. Appellant was sentenced to life imprisonment.

Appellant's principal grounds of appeal are: (1) he was prevented from receiving a fair trial upon his defense of diminished capacity because pursuant to stipulation of counsel the guilt and insanity phases of his trial were combined; (2) as a matter of law the evidence does not establish murder in the first degree.

About 1:30 p.m., on December 24, 1965, appellant walked into the central office of Alcoholics Anonymous in Van Nuys and directly over to a desk in the rear where Jesse Wells, the office manager, was sitting. Appellant inquired of Wells, "Are you Jess Wells?" Wells said "Yes." Appellant then killed Wells by shooting him with a hand gun he had been carrying in an attaché case specially fashioned for this purpose. He left at once.

---

[1]Appellant also appeals from the denial of his motion for new trial. Such denial is not separately appealable but will be reviewed herein. (Pen. Code, § 1237, subd. 1.)

The background of this killing is as follows. On September 6, 1964, appellant and one Barbara Smith, both members of Alcoholics Anonymous, were married. They separated three days later and some weeks later Barbara filed an annulment action which apparently was subsequently changed into a divorce action. Toward the end of January 1965, Barbara moved and thereafter tried to keep her address and phone number from becoming known to appellant.

In June of 1965, appellant phoned Richard Webb, who had been called to be a witness in the divorce action and who had been appellant's sponsor in Alcoholics Anonymous. Appellant told Webb that he was going to kill him, that he was going to get Bruce Gleason, who had been Barbara's attorney in the lawsuit, and that he wanted Barbara's phone number. During the first two weeks of the following month, July 1965, appellant phoned Webb some 10 to 20 times per day and repeated his threat to kill him.

In this same month appellant started phoning the central office of Alcoholics Anonymous in Van Nuys where Barbara had worked as a volunteer. He requested her phone number but his requests were repeatedly refused. All members of Alcoholics Anonymous knew that telephone numbers and addresses of the individual members were confidential.

In the early part of November 1965, Gage Christian Hartman, the chairman of the board of directors of Alcoholics Anonymous, phoned appellant to find out what his complaints were about the central office in Van Nuys. Appellant replied that the volunteer workers, who were generally fellow members of Alcoholics Anonymous, would not give him his former wife's telephone number and that they were a source of gossip about him. Hartman assured appellant that he would see to it that no more gossip about appellant emanated from the office and he subsequently endeavored to do so. But he also told appellant that the staff could not give him his former wife's telephone number and could do no more than relay his request that she call him. This they had already done to appellant's knowledge.

Thereafter appellant phoned Hartman 10 or 12 times. At first he simply repeated his complaints but in the last 5 or 6 calls appellant started threatening to close the office if Hartman should fail to do so.

Sometime in November 1965, appellant walked into the central office and announced that he had come to close the place. He was carrying a plaid satchel which he dropped on the desk

of one of the volunteer workers, a fellow member of Alcoholics Anonymous. The worker heard the thud of metal hitting against metal and momentarily saw what looked like the top of a gun barrel in the satchel. She became frightened. Appellant demanded Barbara's telephone number and she showed him the files to prove that they did not have it.

During the next few weeks, appellant continued to call seeking Barbara's telephone number and address and assistance in getting in touch with her. Staff members had to tell him again and again that the office manager would not allow them to give out a member's telephone number or address and about three times they had to turn appellant's telephone call over to the office manager, the aforementioned victim, Jesse Wells. On the first occasion, after telling appellant that it was against the rules of the office to give him Barbara's telephone number and to come on down if he wanted to do so, Wells hung up on appellant. During each of these three calls Wells got louder and angrier before eventually hanging up on appellant.

Appellant continued to brood over the loss of his former wife. He blamed their divorce, which became final on November 16, 1965, on Gleason, her attorney, and Webb, who appellant thought had been a witness against him. He felt that the workers at the Van Nuys central office had conspired against him in helping Barbara obtain her divorce and in keeping him from finding her. He complained bitterly to his close friends in Alcoholics Anonymous about this group's persecution of him. He told one of his friends, Connie Smythe, that he wanted the central office closed since it was not doing the work of Alcoholics Anonymous.

About a week before Christmas 1965, appellant had a sight mounted on the hand gun which he later used to kill Jesse Wells. He also renewed his repeated threats by telephone to Webb that he was going to kill Webb if Webb was not out of town by Christmas. He called Webb some 10 to 20 times per day.

Appellant was last seen at his place of employment during a Christmas party on the weekend before the killing. On the evening before the killing, at 6:30 or 7 p.m., appellant was noticeably under the influence of alcohol in that his speech was slightly slurred and he was slow in his answers to questions.

Between 8:30 and 9 on the morning of the killing appellant phoned his good friend, the previously mentioned Connie

Smythe, and told her not to go to work since he was going to close the central office. He also said to her, "I don't want you involved; I don't want you to get hurt" as he was "going down and make a mess." About 9:30 that morning and again about 12:45 that day, appellant telephoned Hartman and repeated his demand that the central office be closed or he would do it and Hartman would be sorry. In between these two phone calls appellant had a battery installed in his car and at that time he again appeared to be under the influence of alcohol but not as much as on the previous evening. He also continued to phone and threaten Webb.

About half an hour after the killing, appellant called Connie Smythe a second time. He told her, "You don't have to go to work. . . . I have closed the office. It's a mess down there. . . . Stay away from down there." It appears that he next called another friend and fellow member of Alcoholics Anonymous who was working alone at the Valley Clubhouse. He told this friend that he was coming over to close that place down. At approximately 3 p.m., he again called Webb and said, "Now what do you think, you SOB?" Webb replied, "I feel very sorry for you." Appellant said, "Don't feel sorry for me. Tomorrow you won't be here." Sometime between 4:30 and 5 p.m. appellant again phoned his friend at the Valley Clubhouse and repeated his threat to close that club. About 5:30 p.m. appellant called Hartman back and told him in effect: "I told you what would happen if you didn't close that office. Now you see what happened. Are you going to keep it closed?" Sometime between 6:30 and 7 that evening he called his friend at the Valley Clubhouse for the third time and told him that he had shot Jesse Wells and was going to get the others before he was through. His friend replied that he had heard that Wells had died from a heart attack to which appellant replied "I am glad I didn't kill him."

The following day, Christmas, the phone calls commenced again. At approximately 10:30 a.m. appellant called the Hartman home, spoke to Mrs. Hartman and told her that she should get her husband to close that office "because if he doesn't he's next on my list." He also called Webb that morning and threatened his life again. In the afternoon he called the Webb residence twice and talked to Mrs. Webb who tried to keep him talking so the police could trace his call. She also gave him Barbara's phone number. At approximately 5 p.m., he started telephoning Barbara who also cooperated with the police in trying to keep appellant on the phone as long as

possible. Appellant told her that he had killed a man to get her phone number and that he would kill as many people as he had to if they were keeping them apart. At approximately 6:45 p.m. the police located, disarmed and arrested appellant. There were at least two empty bottles of bourbon in his room at the time of the arrest and another that was half empty.

At the time of the killing there was nothing unusual about appellant's appearance. Likewise in his three calls to Hartman on the day of the killing appellant's speech was not slurred, he spoke calmly and clearly and gave no evidence of intoxication. Mrs. Hartman also testified that in his Christmas morning telephone call to her appellant was very gentlemanly, calm and lucid. Connie Smythe testified to much the same effect regarding appellant's manner of speaking in the two calls he made to her on the day of the killing. Similarly Mrs. Webb testified that in his telephone conversations with her on the day after the killing appellant seemed very cold, calm and quite collected. Finally, Barbara Smith's testimony was that appellant sounded very quiet and calm when he telephoned her Christmas evening.

As stated at the outset of the opinion, appellant first attacks his conviction on the basis that he was denied a fair trial because by stipulation of counsel the guilt and insanity phases of his trial were combined. This ground is without merit. ▮ ·· There is nothing inherently wrong with a waiver of a defendant's statutory right to a bifurcated trial in a case tried to the court alone. (*People* v. *Dessauer*, 38 Cal.2d 547, 552-554 [241 P.2d 238], cert. den., 344 U.S. 858 [97 L.Ed. 666, 73 S.Ct. 96].) The purpose of this deviation from the statutory procedure was, of course, to save the time of the psychiatrists and the other witnesses who then only had to testify once. We have examined the record carefully and find, contrary to appellant's assertion through his appointed counsel, no evidence of confusion of the two issues of guilt and legal insanity in either the psychiatrists' testimony or in their reports which were introduced in evidence as exhibits. In our opinion the consolidation of the two phases of the trial did not prejudice appellant.

▮ Appellant next attacks the admission in evidence of the testimony and report of Dr. Edwin E. McNeil because, according to appellant, his appointment by the court, pursuant to Penal Code, section 1027, had been vacated prior to the submission of his report and prior to his testimony at the trial. Appellant objected to the use in evidence of Dr. Mc-

Neil's report when the psychiatric evidence was first under discussion between counsel and the court and again at the conclusion of the psychiatric evidence, appellant moved the court to strike Dr. McNeil's testimony on the ground that long before testifying he had been removed from the case. He renewed this motion just prior to argument.[2]

In this connection the minutes of the court show that on February 4, 1966, Dr. McNeil was one of two psychiatrists then appointed by the court to examine appellant under Penal Code, section 1027. A month later, on March 4, 1966, the following entry appears in the court's minutes: "It appearing to the Court that the Doctors previously appointed cannot perform the examinations, the Court now appoints Doctor Harold C. Deering, Doctor J. M. Nielsen and Doctor George Thompson, under 1027 Penal Code." Nevertheless, on July 6, 1966, Dr. McNeil was called as a rebuttal witness for the prosecution. His report was marked for identification as People's Exhibit 20 and was thereafter received in evidence. The doctor was examined and cross-examined at length. At the conclusion of his testimony, as just indicated, appellant's counsel, at appellant's insistence, moved that his testimony be stricken. The motion was denied.

There was no error in such denial. There is some question as to whether the motion was timely. It should have been made at the time Dr. McNeil was called to testify. (See Witkin, Cal. Evidence (2d ed. 1966) § 1285, p. 1188; cf. Evid. Code, § 353, subd. (a).) But regardless of this, it was proper for the People to call Dr. McNeil as a prosecution witness whether or not there was then outstanding a valid appointment of him as an expert witness under Penal Code, section 1027. Expert witnesses on the issues of diminished capacity and legal sanity at criminal trials are not limited to those appointed by the court pursuant to Penal Code, section 1027. (See former Code Civ. Proc., §§ 1870, subd. 9, 1879; Pen. Code, § 1321; cf. Evid. Code, § 700.) In this connection it is of interest to note that appellant stipulated to Dr. McNeil's qualifications as an expert witness "in the field of psychiatry" at the commencement of the doctor's testimony.

This brings us to appellant's main basis for this appeal—his claim that we should exercise the power vested in us by Penal Code, section 1181, subdivision 6 to reduce the offense

[2] The reports of the four psychiatrists who testified were admitted in evidence. This was done without objection except for Dr. McNeil's report as to which the only objection made was on the ground stated in the opinion and not on the basis that it was hearsay evidence.

found because as a matter of law the finding of first degree murder is not supported by the evidence.

Penal Code, section 187 defines murder as '' [T]he unlawful killing of a human being, with malice aforethought.'' Penal Code, section 189 provides in relevant part that ''. . . any other kind of wilful, deliberate, and premeditated killing . . . is murder of the first degree; and all other kinds of murders are of the second degree.''

Of the four psychiatrists who testified and whose reports were received in evidence, only one, Dr. George N. Thompson, was of the opinion that at the time of the killing appellant was legally insane and was unable to act wilfully, deliberately, with premeditation and with malice aforethought. He based these opinions upon his diagnosis of appellant as then suffering from ''schizo-affective psychosis with repeated depressive reactions . . . severe recurrent alcoholism . . . chronic brain syndrome.'' More specifically he believed that at the time of the killing appellant, who was a former combat pilot, was under the delusion that he was on a bomb run and had reached the point of no return and that because of this delusion appellant's mind was then out of his control. Appellant's drinking on the evening and the morning before the killing, in Dr. Thompson's opinion, made his schizophrenia more severe at the time of the killing and at that time his mental state was similar to that of one acting under an irresistible impulse.[3]

Dr. Thompson made a detailed four-hour examination of appellant on April 8, 1966. However, his above opinions as to appellant's mental state at the time of the killing were formed without knowledge of most of the background of the killing—that is, appellant's many unsuccessful attempts to secure his former wife's phone number and address from Alcoholics Anonymous, in particular from the staff of the central office, and his numerous threats to different persons in connection with these attempts and with his divorce. Furthermore, Dr. Thompson's belief that appellant killed Jesse Wells while under a delusion that he was on a bomb run originated from what appellant told him to this effect. All that Dr. Thompson learned subsequently about the circumstances leading up to the killing failed to alter his opinions

---

[3]Of the four psychiatrists who testified, Dr. Thompson was the only one to whom appellant was willing to talk concerning his recollection of the killing. Dr. Thompson, pursuant to court direction, gave appellant an alcohol activated, electro-encephalographic examination and found that appellant ''appeared to have a high degree of tolerance to alcohol.''

except that he conceded that appellant was capable of planning the killing and that appellant had been obsessed with the idea of getting his wife's telephone number.

Dr. J. M. Nielsen was the second psychiatrist to testify for the defense. In his report dated April 14, 1966, which was received in evidence,[4] he found appellant legally insane at the time of the killing and still legally insane at the time of his examination of appellant in April of 1966 and concluded that appellant was suffering from "schizophrenia with psychopathic elements." He heard most of the testimony of Dr. Thompson, who testified in full on July 5, 1966, and also read the proposed opening statement of the prosecution which had been received in evidence as an exhibit. On the basis of this additional information as to the extensive preparation behind the killing, Dr. Nielsen, while on the stand, changed his previous opinion and testified, to the surprise of both appellant and his counsel, that at the time of the killing appellant was legally sane and had the ability to premeditate, deliberate and kill with malice aforethought. In Dr. Nielsen's revised opinion, at the time of the killing appellant was "a little bit" mentally ill but the killing of Jesse Wells was not an impulsive act. According to Dr. Nielsen's testimony the motive behind the act was schizophrenic but its plan and execution was psychopathic—that is, planned and done without regard to consequences. In Dr. Nielsen's opinion appellant was suffering from schizophrenia which was incurable but which fluctuated in effect upon him from zero to 100 percent and which apparently did not affect his ability to plan the crime.

In rebuttal the People offered the testimony and reports of two psychiatrists, Dr. Harold C. Deering and the previously mentioned Dr. Edwin E. McNeil.[5] Dr. Deering was of the

[4]As noted by appellant in one of the numerous papers he has filed with this court, Dr. Nielsen filed a supplemental report with the trial court dated June 7, 1966, which was prepared by him after receipt of appellant's medical history. To his original diagnosis, he then added "chronic alcoholism." This supplemental report is found only in the superior court file of this case, CR 316554, and was apparently not introduced in evidence.

Appellant has complained both to this court and our Supreme Court about the adequacy of the record on appeal in this case. In response to these complaints and pursuant to rules 12(a) and 30 of the California Rules of Court, we have added to the record before us the just mentioned superior court file and all exhibits received in evidence. As so augmented the record is entirely adequate and accurate for purposes of appellate review.

[5]As appellant also noted in one of the many papers he has filed with this court, Dr. McNeil's report was inadvertently omitted from the supplemental clerk's transcript which contains the reports of the other three

opinion that at the time of the killing appellant was legally sane and could premeditate, deliberate and kill with malice aforethought. In his opinion the murder was a planned one and appellant did not then suffer from any mental illness which would have prevented him from killing Wells with premeditation, deliberation and malice aforethought. According to Dr. Deering the only mental illness which appellant then had was of a character immaturity type.

Dr. McNeil likewise was of the opinion that at the time of the killing appellant was legally sane and had sufficient mental capacity to premeditate, deliberate and kill with malice aforethought. In his opinion appellant was emotionally unstable and upset and annoyed over the way he felt he had been mistreated by the people at the central office of Alcoholics Anonymous. He was not delusional, however, in his thinking about this. According to Dr. McNeil, appellant's problem was one of deterioration in the functioning of his personality rather than any organic mental deterioration and his drinking about the time of the killing did not diminish his mental capacity to a point where he could not premeditate, deliberate and kill with malice aforethought.

Each of the four psychiatrists had as a basis for his testimony, among other things, his own examination of appellant, his report on that examination, the report of each of the other psychiatrists, appellant's voluminous medical and military history, and the already mentioned prosecutor's proposed opening statement which contained the background of the killing. The trial court, in stating in open court its basis for finding appellant guilty of first degree murder, commented that appellant had told Dr. Thompson that alcohol had one or two effects on him—"he either became comatose or he is fully operational" and that from the testimony of witnesses who observed him at and around the time of the killing he obviously was then "fully operational" and that therefore "alcohol and intoxication is [sic] not a factor in this case." The trial court also alluded to the fact that appellant, in his interview with Dr. Thompson, had suggested not only the possibility of the bomb run delusion but also circumstances which would indicate that he then might have thought he was acting in self-defense in shooting Wells; that these two interpretations of his conduct were mutually exclusive and therefore the

psychiatrists which were admitted in evidence. However, we have examined Dr. McNeil's report in the superior court file which, as we have previously stated, we have made part of the record on appeal in this case.

trial court rejected both of them as mere attempts by appellant to fashion a defense which might save him from the consequences of his act. It is to be noted that appellant was described by several witnesses as being of above normal intelligence. The trial court then said that on the basis of the evidence before him appellant had killed Jesse Wells because he resented the central office being a source of gossip about him and his former wife, and because the staff refused to give him his former wife's telephone number; that appellant was obviously emotionally unstable at the time of the killing but that his capacity to commit first degree murder had not been diminished.

The first question to be answered with respect to any reduction of the offense is whether there should be a reduction to voluntary manslaughter because no one contends that appellant's killing of Jesse Wells was unintentional. (See *People* v. *Forbs,* 62 Cal.2d 847, 853 [44 Cal.Rptr. 753, 402 P.2d 825].) Manslaughter is the unlawful killing of a human being *without malice aforethought.* (Pen. Code, § 192.) The statutory definition of such malice (Pen. Code, § 188) is as follows: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." "An awareness of the obligation to act within the general body of laws regulating society, however, is included in the statutory definition of implied malice in terms of an abandoned and malignant heart and in the definition of express malice as the deliberate intention unlawfully to take life." (*People* v. *Conley,* 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].)

The mental state constituting malice aforethought does not require any ill will or hatred toward the victim and when one acts with wanton disregard for human life, that is, when one does an act that involves a high degree of probability that it will result in death, he then acts with malice aforethought. An intentional act which is highly dangerous to human life and which is done in disregard of the actor's awareness that society requires him to conform his conduct to the law is accomplished with malice, regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified. If because of mental defect, disease, or intoxication, however, the defendant

is unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought. (*People* v. *Conley, supra,* 64 Cal.2d 310, 321-322.)

Three of the four psychiatrists who testified in this case were of the opinion that appellant, at the time of killing Jesse Wells, did have the mental capacity to kill with malice aforethought. On conflicting psychiatric evidence of this character the question of appellant's capacity to kill with malice aforethought was one for the trier of fact to resolve and its resolution of the conflict may not be disturbed by us on appeal provided such resolution is supported by substantial evidence. (*People* v. *Theriot,* 252 Cal.App.2d 222, 240 [60 Cal.Rptr. 279], hear. den.) We find such substantial evidence in the opinions of the three psychiatrists and in the other evidence which supports these opinions.[6]

The next question, whether the offense of murder should be reduced from first to second degree, is more difficult. The difference between first and second degree murder is basically one of the quantum of the personal turpitude of the offender. This quantum is, however, measured by the character of the particular homicide involved. (*People* v. *Holt,* 25 Cal.2d 59, 89 [153 P.2d 21].) By conjoining the words "unlawful, deliberate and premeditated" in the statutory definition of murder of the first degree, the Legislature apparently intended to require as an element of this crime, "substantially more reflection than may be involved in the mere formation of a specific intent to kill." (*People* v. *Thomas,* 25 Cal.2d 880, 900 [156 P.2d 7].)

The test of such reflection in a case where the defendant may have a diminished capacity must include consideration of the somewhat limited extent to which such a defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act. (*People* v. *Wolff,* 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959].) Where the defendant "is not a fully normal or mature, mentally well person" and the extent of his understanding, reflection upon and comprehension of the crime and its consequences, with realization of the enormity of the evil involved, appears to have been materially "vague and detached" he can be guilty

---

[6]To date, our Supreme Court has apparently never reduced a finding of first degree murder to manslaughter notwithstanding its power to do so. This may be because of the less complex character of the required intent. (See *People* v. *Hoxie,* 252 Cal.App.2d 901, 914-916 [61 Cal.Rptr. 37].)

of no more than second degree murder. (See *People* v. *Wolff, supra,* 61 Cal.2d 795, 822.)

This principle of diminished capacity in murder cases was applied in the recent cases of *People* v. *Goedecke,* 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777], and *People* v. *Nicolaus,* 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787]. In both cases the psychiatrists' testimony was divided. In the first case the division was even while in the second it stood at three to two in favor of the defendant's lack of ability to form the specific intent required for first degree murder. In *Goedecke* the court noted that "there was no psychiatric testimony as to the *extent* to which defendant could *maturely* and *meaningfully reflect* upon the gravity of his contemplated act." (65 Cal.2d at P. 857.) Similarly in *Nicolaus* the comment is made that neither of the psychiatrists testifying for the People "expressed an opinion as to the extent of defendant's ability to maturely and meaningfully reflect upon the gravity of his contemplated act." (65 Cal.2d 878.) Moreover, in *Nicolaus* it was pointed out that "both the expert and nonexpert testimony established conclusively that [the] defendant was not a normal person either mentally or emotionally." (65 Cal.2d at p. 878.)

Here, as in *Goedecke* and *Nicolaus,* the psychiatrists' testimony is conflicting. Three of the four psychiatric witnesses testified that at the time of the killing appellant possessed the mental capacity to form the specific intent required for first degree murder. One, on the other hand, thought appellant legally insane and lacking in such capacity at that time. Here, as in *Goedecke* and *Nicolaus,* a search of the record reveals that none of the three psychiatrists who opined that appellant possessed at the time of the killing the mental capacity to form the requisite first degree murder intent were asked to express an opinion as to the extent to which appellant at that time could maturely and meaningfully reflect upon the gravity of his contemplated act. Moreover, there is no question but that at this time appellant was not a normal person.[7]

Nevertheless, we believe that the evidence before us in this case is sufficient to support the finding of first degree murder. In this respect we see no problem with respect to either *People* v. *Wolff, supra,* or *People* v. *Ford,* 65 Cal.2d 41

---

[7]At the time of the killing and for some time before, appellant was living under the name of "Harry Regret." Appellant had been a military pilot in both World War II and the Korean conflict and until 1962 had worked generally as a commercial airlines pilot. At the time of the killing, he was employed by Decca Records as a shipping clerk.

[52 Cal.Rptr. 228, 416 P.2d 132]. In *Wolff* the psychiatrists' testimony was unanimous that the defendant, a 15-year-old boy, was legally insane at the time he murdered his mother. (61 Cal.2d at pp. 799, 803.) Likewise, in *Ford,* the prosecution presented no psychiatric testimony to refute the evidence offered by the three defense psychiatrists who testified to the effect that at the time of the shooting of the deputy sheriff the defendant was unable to form the requisite intent for first degree murder. (65 Cal.2d at p. 55.)

In both *Goedecke* and *Nicolaus* the crimes were peculiarly horrible, familial murders. In *Goedecke,* an 18-year-old boy beat and stabbed his father to death and bludgeoned his mother, brother and sister to death. The jury found him guilty of first degree murder of his father and of second degree murder of his other victims but found him legally sane when he killed his father and legally insane when he committed his subsequent killings. (65 Cal.2d 850, 852-854.) In *Nicolaus* a father murdered his three children by shooting each in the head several times. (65 Cal.2d 866, 869.) In *Goedecke* the court emphasized that defendant's ''actions during the commission of the killings and afterwards were completely foreign to his character and to his relationship with his family,'' and that he was then precariously balanced on the edge of insanity. (65 Cal.2d 850, 858.) In *Nicolaus,* besides emphasizing, as previously noted herein, the defendant's abnormality, the court specifically called attention to the fact that the psychiatrist testifying for the People, who opined that defendant was not mentally ill, did not have in his case history any reference to defendant's previous bizarre and abnormal conduct upon which the opposing psychiatrists relied for their contrary opinions. (65 Cal.2d 866, 878.) In short, again the defendant in *Nicolaus,* from the character of the killings involved, appears to have been at the crucial time quite close to the borderline between sanity and insanity.

Appellant does not appear to have been such a case. It is true that he killed a comparative stranger after much threatening conduct toward others over a period of months. However, the killing was neither unmotivated nor unplanned. Appellant's medical history from 1962 to 1965 was introduced in evidence by his counsel. This shows that although hospitalized several times from 1962 to 1966 and under extended outpatient treatment in 1963, all medical treatment received by him during these four years was voluntary, none resulted in a definite diagnosis of mental illness, and all had to do

with recurrent alcoholism. The diagnosis contained in the last hospital report, from the Brentwood Veterans' Hospital less than five months before the killing, agreed substantially with the diagnosis made at the time of appellant's first voluntary hospitalization in the Houston Veteran's Hospital in 1962. The Brentwood diagnosis was ''emotionally unstable personality'' and ''alcoholism.''

In this case, none of the psychiatrists expressed an opinion in so many words that at the time of the killing appellant possessed the mental capacity to maturely and meaningfully reflect upon the gravity of his contemplated act. However, we do not regard this omission as decisive. Three of the psychiatric witnesses testified that at the time of the killing appellant was not only legally sane but also possessed the ability to deliberate and premeditate. Each of these opinions embodied an implicit opinion that appellant had at that time the requisite reflective capacity. Moreover the record contains other substantial evidence, which we need not here repeat, indicating such capacity.

The judgment is affirmed. The purported appeal from the denial of the motion for new trial is dismissed.

Ford, P. J., and Moss, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 17, 1968.