[Crim. No. 4435. Fourth Dist., Div. One. Sept. 3, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
WHITNEY NERO, Defendant and Appellant.

## COUNSEL

James A. Hutchens, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Rodney Lilyquist, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

AULT, J.—On March 4, 1970, the San Diego County Grand Jury returned an indictment charging appellant Whitney Nero with murdering Hezekiah Patterson. Two days later, Nero was arraigned in the superior court. Although the transcript of the grand jury proceedings had not been prepared, he entered a plea of not guilty, reserving the right to move to quash the indictment and to make other appropriate motions at a later time.

On April 15, 1970, Nero's attorney filed a notice of motion which was treated by all parties as a motion to quash the indictment on the ground of unconstitutional discrimination in the selection of the grand jury. The motion was heard and denied on April 29, 1970, the trial court finding ". . . no systematic exclusion occurred and no discrimination against defendant in selection of the Grand Jury." Appellant waived a jury trial and was eventually found guilty of second degree murder by the court. He was sentenced to prison for the term prescribed by law. He appeals from the judgment of conviction.

## SELECTION OF THE GRAND JURY

Nero's initial contention on appeal concerns the denial of the motion to quash the indictment. He first asserts an erroneous ruling by the trial court precluded him from obtaining and presenting evidence essential to his challenge to the grand jury. Secondly, he contends the evidence produced showed the California grand jury selection statutes, as applied in San Diego County, resulted in unconstitutional discrimination against young people. Discussion of these issues requires us to summarize the evidence introduced at the hearing in the superior court.

The record was a meager one. All of the evidence was received by stipulation. It consisted of:

1. A transcript of the testimony of five San Diego County Superior Court judges taken in a hearing in another case in which they were questioned as to the criteria they used in nominating persons to the panel from which the grand jury was drawn.[1]

2. Various stipulations as to statistical facts based on the 1960 census, i.e., the number of people residing in San Diego County between the ages of 20 and 30 was slightly in excess of 150,000; the median age was 26.4 years; the average annual gross family income was $6,545 which, it was agreed, would extrapolate to $8,299 for the year 1970.

3. The following questionnaire which was submitted to and filled out by each grand juror and received in evidence in lieu of his sworn testimony:

"1. What is your age?

2. What is your area of residence?

3. What is the extent of your education?

4. What is your race?

5. How many hours per week, between the hours 8:00 A.M. and 5:00 P.M., do you spend on Grand Jury work?

6. What is your and your spouse's estimated net worth?

7. Would you please check the answer that most appropriately describes your gross income for 1968 and 1969.

---

[1]This testimony, in fact, did not relate to the selection of the 1970 grand jury. At the time names for the 1970 grand jury were nominated, there were 22 judges of the San Diego Superior Court (71 Cal.2d, pp. xi-xii). The procedure followed was that each of the judges nominated four persons to the original grand jury panel. In accordance with Penal Code provisions, the list was first drawn down to 30 and later to the 19 who finally constituted the 1970 grand jury. It was stipulated at the hearing statutory procedures were followed.

|  | 1968 | 1969 |
|---|---|---|
| Less than $5000...................... | —— | —— |
| $5000 to $7000 ........................ | —— | —— |
| $7000 to $9000 ........................ | —— | —— |
| $9000 to $11,000...................... | —— | —— |
| $11,000 to $13,000 .................... | —— | —— |
| $13,000 to $15,000 .................... | —— | —— |
| $15,000 to $17,000 .................... | —— | —— |
| Above $17,000 ........................ | —— | —— |

8. Do you live South of Broadway in the City limits of San Diego?"

4. The above questionnaire and Nero's answers to the pertinent questions contained in it.

Questions 5 and 6 evidently caused some consternation to the members of the grand jury and resulted in a conference attended by the trial judge, the presiding judge and the presiding judge of the criminal department. The grand jurors had not been in office for a sufficient period to estimate accurately the number of hours per week they devoted to grand jury work. This problem was resolved at the hearing by a stipulation to the effect the grand jurors would spend "at least an average of two days a week on Grand Jury work during the year." As to question No. 6, which required the jurors to state their estimated net worth, the trial judge ruled the question improper and did not require the grand jurors to answer it. None of the 19 grand jurors answered the question.

The answers to the questionnaire were compiled and showed: Of the 19 members of the grand jury, 15 were Caucasians, 2 were Negroes, 1 was Japanese, and 1 was Mexican-American. As to income, 3 members reported a gross income of less than $5,000 for the year 1968, 2 for the year 1969; 7 members reported an income in excess of $17,000 for the year 1968, 8 for 1969. Income of the other members ranged between $5,000 and $17,000 for the two years. Their ages ranged from 32 to 68 years; the average age was 55.6 years. Twelve members lived in the City of San Diego; seven in various areas in the county. Of those living in the City of San Diego, two lived south of Broadway. Their education ranged from 8 to 17 years, the average being 13.9 years.

Nero's answers to the questionnnaire reflected he was 25 years of age, black, had completed 7 years of education, earned less than $5,000 in 1968 and between $5,000 and $7,000 in 1969, and lived in the City of San Diego, south of Broadway.

■ Nero's claim he was deprived of essential statistical information upon which to base his challenge to the grand jury on the ground the

economic group of which he was a member had been systematically excluded from the selection process is predicated on the trial court's refusal to permit the question requiring each grand juror to reveal his estimated net worth. Such information is universally regarded as confidential, and reason dictates a grand juror's right to privacy in this area should be preserved. Citizens who become grand jurors are not divested of their own rights, and they are not volunteers (see Pen. Code, § 909 and Code Civ. Proc., § 201). In the quest to assure a criminal defendant his constitutional rights, we need not abandon reason. Nor does it follow a defendant's rights must invariably prevail when they conflict with the rights of others. Balancing appellant's need for the requested information to provide a basis for his challenge to the grand jury selection method against the individual grand juror's right to privacy, we conclude the latter outweighs the former and the trial court's ruling was correct.

Had the requested information been supplied, and had it shown all members of the 1970 grand jury were wealthy and that appellant was poor, his challenge on the ground of economic discrimination could not have prevailed. ■ Proof a particular jury contained no representative of a defendant's group or class does not establish constitutional discrimination in the selection process. (*Hernandez* v. *State of Texas,* 347 U.S. 475, 482 [98 L.Ed. 866, 872, 74 S.Ct. 667, 672]; *People* v. *Newton,* 8 Cal.App.3d 359, 390 [87 Cal.Rptr. 394]; *Montez* v. *Superior Court,* 10 Cal.App.3d 343, 349 [88 Cal.Rptr. 736].) A prima facie case of systematical exclusion of a group is not made out by statistics alone without a showing the group has been excluded over an extended period of time. (*Hernandez* v. *State of Texas, supra,* 347 U.S. 475, 480 [98 L.Ed. 866, 871, 74 S.Ct. 667, 671]; *Norris* v. *State of Alabama,* 294 U.S. 587, 591 [79 L.Ed. 1074, 1077-1078, 55 S.Ct. 579, 581].) ■ Appellant offered no evidence bearing on the issue of economic discrimination except information contained in the questionnaire submitted to the 1970 grand jury.[2] Since the challenge could not have prevailed had the information been furnished, the trial court's ruling refusing to permit the question concerning net worth was unquestionably correct. There was no need to invade the individual juror's right of privacy where to do so could not have benefited appellant.

■ What we have said has equal application to appellant's contention he established an unconstitutional discrimination against "young people"

---

[2]All of the five superior court judges whose testimony was offered, testified to the effect they did not consider money or financial status as a criteria for selection. Certainly appellant did not establish a purposeful exclusion of poor or low income persons by the selecting judges.

in the grand jury selection process in the superior court hearing. We need not decide whether "young people" constitute a legally cognizable group upon which to assert an equal protection of the laws argument. Even if we were to assume this premise, the evidence produced falls far short of showing systematic exclusion of "young people" in the selection process. The statistical information presented pertained to the ages of the members of the 1970 grand jury only. As in *People* v. *Newton, supra,* 8 Cal.App.3d 359, 389, this evidence may have shown the particular grand jury which indicted appellant was made up of middle-aged persons, but it failed to establish a purposeful systematic exclusion of "young people."

Moreover, only 5 of the more than 20 superior court judges involved in the selection process testified concerning their practice in nominating persons for the grand jury list. Of these one judge indicated he attempted to choose retired persons. Another judge, on the other hand, made an effort to nominate young women. No evidence was presented of the selection practices with respect to age followed by the other 20 superior court judges. █ Purposeful discrimination resulting in systematic exclusion is not to be assumed or merely asserted. It must be proved, and the burden was on appellant to establish a prima facie case it existed by evidence produced at the hearing in the superior court. (*People* v. *Newton, supra,* 8 Cal.App.3d 359, 389.) █ This he failed to do, and his claim to the contrary on appeal is rejected.

### SUFFICIENCY OF THE EVIDENCE

█ The evidence irrefutably establishes Nero stabbed and killed Hezekiah Patterson on February 5, 1970, and he has never contended to the contrary. While asserting the evidence is insufficient to support his conviction of second degree murder, he concedes it would support his conviction of voluntary manslaughter. The trial court determined Nero acted with malice but without meaningful and mature deliberation and, accordingly, found him guilty of second degree murder. The finding is amply supported by the evidence.

Two days before the homicide Nero, the decedent Patterson, and a man named Jett engaged in a fight outside their rooms in the Callen Hotel. The police were called. Nero was so severely beaten he was taken to the hospital for treatment. He claimed Patterson and Jett, at Patterson's urging, had pistol whipped him. Nero, however, refused to prosecute, stating he would take care of it himself. During the next two days, several witnesses heard him make similar threatening remarks. Contending he was reacting to a threat he believed to exist (he testified he believed the man he stabbed was Jett and thought he was pulling a gun) and that he was in a highly

emotional state engendered by his earlier beating and by alcohol and drugs, Nero questions the court's finding of malice. However, two days passed between the fight and the homicide, and the prosecution presented substantial evidence Nero was not acting under the influence of either drugs or alcohol.

■ A homicide committed during the heat of passion justifiably engendered is not murder in the first degree. Depending upon the surrounding circumstances, including the extent of the provocation and whether there was time for temper to cool, such a homicide may be murder of the second degree or voluntary manslaughter. (*People* v. *Bender*, 27 Cal.2d 164, 179-180 [163 P.2d 8]; *People* v. *Perrotta*, 224 Cal.App.2d 498, 504 [36 Cal.Rptr. 813].)

■ Under the circumstances of this case the existence and extent of provocation, whether sufficient time had passed for temper to cool and reason to return, whether Nero had the capacity to kill with malice, and whether he acted in self-defense, were all questions of fact addressed to the trier of fact. (See *People* v. *Thomas*, 25 Cal.2d 880, 903-904 [156 P.2d 7]; *People* v. *Caylor*, 259 Cal.App.2d 191, 203 [66 Cal.Rptr. 448]; *People* v. *Davis*, 63 Cal.2d 648, 654 [47 Cal.Rptr. 801, 408 P.2d 129].) Since substantial evidence supports the trial court's implied findings on these questions, we have no power to disturb them. (*People* v. *Mosher*, 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].)

### EXERCISE OF JUDICIAL DISCRETION AT THE SENTENCING

■ There is no merit to Nero's contention the trial judge erroneously believed he was without power to grant probation and therefore failed to exercise judicial discretion in sentencing him. Nero relies on two remarks of the trial judge, one made at the beginning of the hearing and the other at its end. After announcing he had read and considered the probation report and other documents and after asking Nero's attorney if he had anything to say on behalf of his client, the trial judge stated: "I think my hands are tied as far as what I can do." After pronouncing judgment, the judge indicated he would recommend schooling, additional training in the trades, and a minimum sentence. He then stated: "This is certainly not the usual case of murder." It is argued these remarks demonstrate the trial judge was unaware of the paragraph in Penal Code section 1203 which provides: "In unusual cases, otherwise subject to the preceding paragraph, in which the interests of justice would best be served thereby, the judge may, with the concurrence of the district attorney, grant probation." The argument takes the remarks out of context and ignores what was said before and in between them. Our review of the record of the entire hearing convinces us the sen-

tence was imposed because the judge believed imprisonment was the appropriate disposition, in view of the gravity of the offense and the information contained in the probation report. At the hearing Nero's attorney in his argument specifically alluded to the provision of the Penal Code section 1203 we have quoted, and urged it upon the court. If the judge was not aware of the power conferred upon him by the provision at the outset, he most surely was before he pronounced judgment. His concluding statement, "This is certainly not the usual case of murder." does not indicate he believed the case to be one calling for the application of the quoted portion of Penal Code section 1203.

The judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J.,* concurred.

A petition for a rehearing was denied September 20, 1971, and appellant's petition for a hearing by the Supreme Court was denied October 27, 1971.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.