[Crim. No. 19322. Second Dist., Div. Four. Apr. 17, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ROBERT BRUNT et al., Defendants and Appellants.

948

COUNSEL

Philip J. Catanzaro, Jr., and Earl Weisbaum, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Robert W. Carney, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**JEFFERSON, Acting P. J.**—In an amended information defendants were charged with murder, in violation of section 187 Penal Code. A prior conviction of a felony was alleged against and admitted by each defendant.

The jury found each defendant guilty of murder in the first degree. Motions for new trial and probation were denied and defendants were sen-

tenced to the state prison for the term prescribed by law. Defendants appeal from the judgments of conviction.

On the night of February 4, 1970, the defendants and the victim, Charles Shrader, were having a party at the home of Grace Bojorquez. They had been drinking and taking drugs such as "reds," "whites," LSD and mescaline. The following morning, the victim agreed to drive the defendants to San Pedro. As they left the residence and started toward the victim's automobile they became engaged in an argument and a fight ensued.

John Lindwall was working at his place of business adjacent to the vacant lot where the fight occurred. He was repairing a truck when he observed the victim and defendants in an argument. They then began to fight. Both defendants were striking their victim, who held his hands up before him in an effort to protect himself. The victim then fell to the ground and both defendants started kicking him about the head and in the upper part of the body. The witness saw that the victim was "kicked or hit in his eye and his face was all swelled up about the size of a big orange around one of his eyes." Lindwall then left the scene to call the police and when he returned a couple of minutes later he noticed defendants bending over the victim who lay on the ground; "they were going through his billfold" and "immediately after they went through his billfold, they took out running."

Grace Bojorquez was acquainted with both the defendants and the victim; they were all at her home and all were "partying" on the night before the killing. The next morning they were in the living room and the victim passed around some reds (pills); the two defendants were present and each took two of the pills. Rene, a friend who was also present, asked "Charlie" (the victim) for some money and he refused to give her any. She left and Grace told the victim in the presence of the two defendants that he at least should go to the store and buy the kids some milk and cereal. He agreed to go. Both defendants left the house with the victim to go to the store with him.

Grace thereafter looked out of the window and saw the three men standing near the victim's car in the vacant lot. They seemed to be arguing. She hurried downstairs and by the time she reached them, they were all on the ground fighting. Defendant Brunt was holding the victim down on the ground and defendant Mayolette was on top fighting. Grace attempted to pull him off the victim. She saw blood on them. Defendant Mayolette motioned towards her and said the blade was over there. She walked over to the fence, but could find no knife. Grace also observed defendants Mayolette and Brunt going through the victim's pockets while he was on the ground. Defendant Mayolette handed Grace a wallet that defendant

Brunt had taken from the victim's pocket. The wallet belonged to Mayolette and Grace later gave the wallet to the police.

Before the police arrived, defendants left the parking lot and went to Alicia's house. Grace followed them into the house where defendants removed their clothes in the bedroom. They gave the clothes to her; she noticed the police were coming, so hid the bloody clothes underneath the mattress. When the police left she retrieved the bloody clothes, put them under her coat and started to leave the house. The police, however, intercepted her and took her to the police station where she gave the clothes up to them.

Richard Pihl, a deputy medical examiner for the County of Los Angeles, performed an autopsy on the victim, Charles Shrader, and listed the cause of death as follows: "Exsanguinated pleural hemorrhage due to puncture wounds of the vena cava and pulmonary artery due to puncture wound of the chest. . . . The wound . . . most important and most prominent was a puncture wound . . . overlying the right nipple. This puncture wound was continuous with the wounds inside the body and the wounds of the vessels that I mentioned, which in my opinion caused the death."

The doctor also expressed an opinion that the letter opener or dagger (People's Exh. 7) found near the body could have inflicted the wounds that caused the death.

Officer Rosalie Ornelas was called to the scene of the disturbance, but by the time he arrived the defendants had disappeared. The officer observed the victim lying on the ground. He called for an ambulance to have the victim transported to a hospital. Officer David Fullerton accompanied the victim to the hospital. He testified that the victim was alive when placed in the ambulance, and he was moaning and moving about at that time. Charles Shrader was pronounced dead by the resident surgeon at Harbor General Hospital at 10:48 a.m. on February 5, 1970, some hours after he was found by the officers.

When Officer Ornelas returned to the place where the victim lay, a man from an adjacent building came out and described to the officer the victim's two assailants. The officer got into his police vehicle and drove north on Wilmington Boulevard, turned right on L Street and then observed both defendants walking. When he yelled at them ordering them to stop they both started running. The officer put out an assistance call, chased the suspects and apprehended defendant Brunt.

Officer Manuel Pacheco responded to Officer Ornelas' broadcast describing defendants and disclosing that they were attempting to escape from the area where a fight had occurred and a man had been injured.

Within 30 seconds thereafter the officer saw defendant Mayolette running away from the area down Rowan Street. That defendant he promptly apprehended; Mayolette was taken to the police station where he was later booked on suspicion of murder.

Within two hours after defendant Mayolette was arrested and transported to the police station, the police car in which this defendant was transported was searched. The officer found the wallet of Charles Shrader (the victim), underneath the rear seat of the vehicle where the defendant had been sitting. No other person had occupied the back seat of the police car. The wallet contained four $20 bills.

Officer Pacheco spent approximately one and a half hours with defendant Mayolette on the date of his arrest and was constantly in his immediate presence. Defendant did not exhibit any symptoms of intoxication and the officer was of the opinion that the defendant was not intoxicated.

Officer Ornelas was in the immediate presence of defendant Brunt after he was arrested and did not believe this defendant was under the influence of alcohol or dangerous drugs.

It was the opinion of both officers that neither defendant was under the influence of intoxicating liquor or dangerous drugs when they were apprehended, which was within an hour after the fight in which fatal wounds were inflicted on the victim, Charles Shrader.

Officer Ryan interviewed defendant Mayolette on February 6, 1970. Before any questions had been asked, Mayolette asked Officer Ryan if Charlie was dead, to which Ryan replied that he was. Mayolette then said, "I stabbed him." He previously had been advised of his constitutional rights. After Mayolette made this spontaneous statement the officer again advised him of his constitutional rights and told him that, inasmuch as he had remained silent the day before, the officer considered this a refusal to waive his rights and the officer would not question him about the incident. Defendant Mayolette then told Officer Ryan that he did it and wanted to tell how it happened.

Defendant made the following statement to Officer Ryan who read it into evidence to the jury:

"Q BY MR. STANLEY [Attorney for Mayolette]: Would you just read it as it is, please.

"A Okay. 2-6-70, 12:15. Mayolette, John Arthur, 3218 Nordyke Street, Sacramento, male, Caucasian, 9-3-48—which refers to a date of birth— 5-10, 155, brown and brown, and there is initials J.A.M., and it starts,

" 'I stayed Grace's apt. the night of Wed. Feb. 4-70, about 6:30/am

Thur. morn Mike came over. He said when he woke up at Aliscia [*sic*] house & his shoes were missing & his pockiet's [*sic*] were turned inside-out. I got dress & went back with him to help him find his shoes & that red head gal was going to give us a ride back to Pedro. We went in & looked around & found his shoe's [*sic*] & other stuff. We waited around for about ½ hour Grace came over in the meantime. We were undicided wether to wait for Rena or take a bus. When Rena got up she said Alicia had the car & she could take us —' Incomplete word there—couldn't 'take us until she got back. She ask Charlie to go to the store & get some ceral [*sic*] & milk for the kids. We all went out to Charlie's car,' and then in parenthesis, '(Mike Grace Charlie & I,)' and then Grace is crossed out—

" '— went out towards the back door. I ask Charlie if he could take us to Pedro. He tried to start the car. Then I tried to start the car but it wouldn't start.'

"Followed by the initials 'J.A.M.'

"Page 2, headed at the top with the initials J.A.M., and then continuing, the text says:

" 'As I got out of the car Mike was saying to Charlie somting [*sic*] to Charlie about being'—correction. I'm sorry. 'Charlie about Charlie getting some food for the kids. Charlie hit Mike in the face. Mike tried to hit him back & Charlie knocked Mike down. Charlie had the knife. (It looked like a minature [*sic*] sword.) ('I don't know where he got it from, I though [*sic*] I had left it at Alicia's house. I had brought it over with me from Grace's that morn. I think I had layed it down on the arm of the couch or the coffee table because I though it looked funny me hold a knife') I got hit but I don't know if it was after I tried to pull the dude away or not. I think

J.M.

I tried to throw him down on the ground.' and above 'him', which was a strikeover, is the initial 'J.M.' 'I don't know how I got the knife away from him or if I got the hole [*sic*] knife. I just ended up with the handle. I don't remember hitting or kicking him, but thats prob.'—and that's an incomplete word—'be what I'd do. But I don't rember. [*sic*] I don't rember [*sic*] stabbing him but when the fight was over I had the knife handle. The blade was broken off I just had the handle.' And then the initials J.A.M.'

"Page Number 3 is headed by initials J.A.M. immediately preceding the text that begins:

" 'Grace was there. She was yelling & pulling on me & telling me to cool it. I don't know if I gave the handle to Grace or kept it and ran.' Then 'ran' is crossed out and initialed J.M. 'Grace went to her apt. & Mike & I went to Alicias house. They let us in. I ask Alicia to go over to the garage

and get me'—correction. That's 'over to Grace & get me some clean cloth. The cloth's I had on were blood stained & the pants were ripped out. I wash my hands bathtub I think. Grace & Alicia came back wtih some clean cloth. I changed cloth. I just left the old one laying on the floor in front bed room. I ask the red head for a ride back to Pedro. She wouldn't give us a ride so we left, we just went a little way & the police were all around. I ran thru a bunch of back yard's but the [*sic*] caught me.' Immediately followed by the initials J.A.M. and then, one line below that is the signature 'John A. Mayolette, Feb. 6, 1970, 1:06 p.m.' "

Sergeant Ryan also had a conversation with defendant Brunt on February 6, 1970. He first advised him of his constitutional rights and told him he was advised that defendant made no statements to the arresting officers on the previous day and therefore he concluded that defendant did not want to make any statements to him. Defendant Brunt replied, 'No I would like to tell you about, it. I don't remember too much though because I was knocked out when the fight first started. We had just left Rena's house, and were going to the store. John was trying to get this guy's car started for him, and I told the guy that he had better be sure and get those kids something to eat when all of a sudden he hit me. I tried to swing at him, but he knocked me down, and knocked me unconscious. The next thing I remember was John helping me up, and the guy was laying on the ground. That's all I can remember, and then the cops brought me down here. I don't know anything about a billfold or money. I never laid a hand on that guy."

Defendant Brunt testified in his own behalf, saying he had taken some reds the night before Charles Shrader's death and when he awakened, he was still loaded. Defendant Mayolette gave him two tablets of LSD and a can of beer. Later that morning he took some more reds and whites.

He did remember being in a vacant lot trying to get Charlie's car started. The victim struck him and he struck back. The three of them began to fight and all of them were on the ground fighting. He had a hunch the victim had his telephone book so he reached into the victim's pocket. There he found Mayolette's wallet, which he took and gave to Mayolette. They left the victim on the ground and went inside Alicia's house and changed clothes. When Alicia told them the police were coming they left. He did not see who stabbed the victim nor did he see a letter opener or knife during the fight.

Defendant Mayolette testified in his own behalf. He took some reds the night before Charles Shrader's death. He did not recall how many but he ate "quite a bit of reds" and a tablet of mescaline. He was still on the "trip" the next morning when the other defendant, Brunt, came over to the

apartment so he took one tablet of "acid." Charlie (the victim) came by the apartment and he, Brunt and Charlie went out to the car and tried to get it started. Charlie and Brunt started to argue and Charlie struck Brunt in the mouth and Brunt fell to the ground. Mayolette snatched the victim by the hair and threw him to to ground. Charlie got up and pulled out a letter opener and said "Both you punks come on." The brawl continued on the ground and he (Mayolette) was holding the victim on the ground. Mrs. Bojorquez tried to separate the men. Mayolette was holding the victim down trying to struggle with the knife which the victim still had in his hand. That was the last time that he saw the knife until he ended up with the knife handle which no longer contained the blade.

Mayolette saw defendant Brunt going through the victim's pockets; Brunt found his wallet and gave it to him. When he left the scene of the fight, he went into Alicia's house and took off his bloody clothes. He and Brunt then left but they were apprehended a short time later.

Both defendants contend it was error for the court to instruct on the felony-murder rule.

The instruction as given was proper. Penal Code section 189 states "All murder . . . committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, . . . is murder of the first degree." ■ Our Legislature has therefore decreed that any person who undertakes to commit any of the enumerated felonies will be guilty of murder in the first degree if it results in the loss of human life. ■ In order to establish a defendant guilty of first degree murder on the theory that he committed the killing during the perpetration of one of the enumerated felonies, the People must prove that he harbored the specific intent to commit one of such enumerated felonies. (*People* v. *Craig,* 49 Cal.2d 313, 318 [316 P.2d 947].)

■ "Under the felony murder doctrine, the intent required for a conviction of murder is imported from the specific intent to commit the concomitant felony. . . . The doctrine of felony murder, therefore, must be limited to those cases in which an intent to commit the felony can be shown from the evidence." (*People* v. *Sears,* 62 Cal.2d 737, 745 [44 Cal. Rptr. 330, 401 P.2d 938].) In the case at bench, the evidence does show "an intent to *commit the felony,*" to wit, robbery.

While in the living room and in the presence of defendants, Rene had asked decedent for money and he refused. The defendants asked decedent for money and he refused them, also. Mrs. Bojorquez in the presence of the defendants told decedent that he at least could go to the store and buy the children some cereal and milk. He agreed and started out with the defendants to go to the store as requested. The only reasonable infer-

ence for the defendants to draw was that the decedent did have money to make the purchases. The defendants attacked the victim. While he was on the ground, they showed their intent to rob by going through his pockets, discarding his personal effects such as envelopes and notes. They finally got his wallet which contained four $20 bills, but had to flee the scene before they could take the money from the victim's billfold. They were apprehended separately and each was transported to the police station in different police cars by different officers. A search of the vehicle in which Mayolette was transported, after the police took him from the rear seat, revealed the wallet of the victim, which one or both of the defendants took from the victim. ■ In either event, one aided and abetted the other in the commission of the robbery. The defendants inferentially started out with the intent to rob and get the victim's wallet and in so doing they had to kill. This was the reasonable inference drawn by the jury from the evidence in the record.

We believe the evidence herein shows that the defendants deliberately committed acts inherently dangerous to human life, such as one of the enumerated felonies (robbery) mentioned in Penal Code section 189, and that these acts demonstrated a malice sufficiently clear to support the charge of murder in the first degree; the jury so found. We believe that we cannot improve on the language used in *People* v. *Caylor*, 259 Cal. App.2d 191, 202 [66 Cal.Rptr. 448]: ■ "The mental state constituting malice aforethought does not require any ill will or hatred toward the victim and when one acts with wanton disregard for human life, that is, when one does an act that involves a high degree of probability that it will result in death, he then acts with malice aforethought. An intentional act which is highly dangerous to human life and which is done in disregard of the actor's awareness that society requires him to conform his conduct to the law is accomplished with malice, regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified."

■ Both defendants contend that the court committed error in refusing to instruct the jury on grand theft from the person as requested and also assault with a deadly weapon. With this we disagree. The two requested-but-refused instructions were not applicable to the instant case. The information here charged murder and the defendants could not have been convicted of assault or of grand theft from the person, for they are not lesser and necessarily included offenses. (See *People* v. *Asher*, 273 Cal.App.2d 876, 905-909 [78 Cal.Rptr. 885].)

■ The court is never required to give any instructions that would

have had no foundation in the evidence or in any theory on which the case was tried. (*People* v. *Carter*, 48 Cal.2d 737, 758 [312 P.2d 665].)

■ Defendant Brunt contends that it was error for the court not to have given an instruction that the felony-murder rule was inapplicable if the intent to steal was not formed at the time of the attack. There is no merit in this contention. No such instruction was offered by defendant nor was it requested that the court give such an instruction. The court did not commit error and was under no obligation to give the suggested instruction *sua sponte*. (See *People* v. *Williams*, 17 Cal.App.3d 554, 566 [95 Cal.Rptr. 234].)

■ Defendant Mayolette contends that the evidence was insufficient to support the verdict. This contention is wholly devoid of merit. The evidence which we have set out in some detail is ample. ■ We have viewed the evidence in the light most favorable to the respondent as we are required to do (*People* v. *Reilly*, 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]), and have determined that the jury was justified in determining that the prosecution sustained its burden of proving the defendants guilty beyond a reasonable doubt. (See *People* v. *Redmond*, 71 Cal.2d 745 [79 Cal.Rptr. 529, 457 P.2d 321].)

■ Defendant Mayolette contends that the admission of his statement was prejudicial error. With this we disagree. The record indicates that defendant asked Officer Ryan before any questions were asked of him "Is Charlie dead?" and the officer answered his question "Yes, he is," and then defendant volunteered the statement "I stabbed him." The officer then fully advised defendant of his constitutional rights and again defendant volunteered, "No, I did it, and I want to tell you what happened." Thus, defendant volunteered the statements and " 'Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.' [Citation]." (*People* v. *Ireland*, 70 Cal.2d 522, 536 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

Defendant Mayolette contends that he was erroneously denied the right to appointment of counsel of his own choosing. ■ However, a defendant does not have the right to the appointment of a particular counsel. (*People* v. *Aikens*, 70 Cal.2d 369, 378-379 [74 Cal.Rptr. 882, 450 P.2d 258].)

■ Defendant Mayolette contends that he was denied effective representation of counsel. This contention also is devoid of merit. Defendant points to a few examples of the questions that counsel asked and criticizes them, and he now does not agree with the trial tactics that his counsel used. But as stated in *People* v. *Floyd*, 1 Cal.3d 694, 709 [83 Cal.Rptr. 608,

464 P.2d 64], "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.]

"Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." No such showing is made herein. (See also *People* v. *Reeves,* 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].)

Defendant Mayolette contends that the admission into evidence of certain photographs of the deceased was reversible error. The photographs were offered to show the wounds inflicted by the defendants and to explain and show those which, in the opinion of the doctor, caused the death of the deceased. "It was within the discretion of the trial court to determine whether the probative value of the photograph outweighed its probable prejudicial effect. [Citations.]" (*People* v. *Talbot,* 64 Cal.2d 691, 706 [51 Cal.Rptr. 417, 414 P.2d 633].) We find no abuse of discretion by the trial judge in admitting the photographs in evidence. The trial court has a broad discretion in determining that the probative value of a photograph was not outweighed by its prejudicial effect. (*People* v. *Williams,* 71 Cal.2d 614, 625 [79 Cal.Rptr. 65, 456 P.2d 633].)

Defendant Mayolette contends that the deputy district attorney's alleged misconduct, when he referred to defendant's arrest record as he cross-examined the psychiatrist, constituted error. No objection was interposed by defendant as the prosecutor cross-examined the doctor called by the court. The doctor's report was received in evidence and no objection was made to it. The report referred to defendant's arrest record and the prosecutor cross-examined the doctor on those matters. We find no misconduct on the part of the prosecutor. "It is well settled, requiring no citation of authority, that misconduct of a prosecutor in a criminal trial may consist of improper remarks in the opening statement, improper examination or cross-examination, . . . However, the term 'misconduct' implies a dishonest act or an attempt to persuade the court or jury, by use of deceptive or reprehensible methods [citations]. Thus, it has also been held that a mere mistake relative to the admissibility of proffered evidence is not misconduct in the absence of a showing that the prosecutor was not acting in good faith [citations]. . . . [T]he burden is on the defendant who claims that the prosecutor was guilty of misconduct to object and to seek a curative admonition. Hence, if he is silent or merely objects or makes the assignment of misconduct but does not request an admonition, he cannot complain on appeal [citation]." (*People* v. *Asta,* 251 Cal.App.2d 64, 86, 87 [59 Cal.Rptr. 206].)

 In the instant case defendant objected to neither the prosecutor's cross-examination nor his reference to defendant's arrest record or to the doctor's report which contained the arrest record.

 We do not believe the prosecutor's conduct was prejudicial but even so, after a review of the entire case, it is not reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from the alleged improper cross-examination. (*People* v. *Watson*, 46 Cal.2d 818, 835 [299 P.2d 243].)

The judgments of convictions are affirmed.

Kingsley, J., and Dunn, J., concurred.

A petition for a rehearing was denied May 2, 1972, and the petition of appellant Mayolette for a hearing by the Supreme Court was denied June 15, 1972.